UNITED STATES, Appellee,

v.

Staff Sergeant Delmar G. SIMPSON,
United States Army, Appellant.

ARMY 9700775.

U.S. Army Court of Criminal Appeals.

30 July 2001.

Brown, J., filed concurring opinion.

For Appellant: Frank J. Spinner (argued); Captain Jodi E. Terwilliger–Stacey, JA (on brief); Captain Stephanie L. Haines, JA.

For Appellee: Captain William J. Nelson, JA (argued); Major Bryan T. Broyles, JA (on brief); Colonel Russell S. Estey, JA; Major Mary E. Braisted, JA; Captain Kelly R. Bailey, JA.

Before BROWN, CARTER, and VOWELL Appellate Military Judges.

## OPINION OF THE COURT

VOWELL, Judge:*

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of violating a lawful general regulation [1] (five specifications), maltreatment (three specifications), rape (eighteen specifications), sodomy (three specifications), assault, indecent acts, indecent assault (twelve specifications), indecent language (two specifications) and communicating a threat (two specifications) in violation of Articles 92, 93, 120, 125, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 893, 920, 925, 928, and 934 [hereinafter UCMJ].[2] Pursuant to his pleas, the appellant was also found guilty of sixteen specifications of violating the same lawful general regulation by soliciting or having personal relationships with sixteen different female trainees.

After the court members returned findings, the military judge ruled that some of the charged offenses stood in a greater-lesser relationship, and required the government to elect which findings of guilty it wished to retain. The military judge thereafter dismissed eight specifications of violating the lawful general regulation (including six specifications to which the appellant had pled guilty), two specifications of communicating indecent language, and one specification of maltreatment of a subordinate.[3]

The court members sentenced the appellant to a dishonorable discharge, confinement for twenty-five years, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority approved the sentence as adjudged.

In this Article 66, UCMJ, 10 U.S.C. § 866, appeal, the appellant contends that unlawful command influence and extensive pretrial publicity tainted his trial. He challenges the

---

\* Judge Vowell took final action in this case prior to her reassignment.

1. U.S. Army Ordnance Center and School Regulation 600–2, Prohibited Practices—Permanent Party and Student Personnel, para. 4b (15 Dec. 1992) [hereinafter OC & S Reg. 600–2], which prohibited personal relationships between cadre members and soldiers in initial entry training.

2. The guilty findings also reflect some findings of lesser included offenses: one specification of indecent assault rather than the charged rape; two specifications of consensual sodomy rather than the charged forcible sodomies; and one specification of indecent assault rather than the charged forcible sodomy. The appellant was acquitted of maltreatment, assault (two specifications), and indecent assault (three specifications). The military judge dismissed one specification of communicating a threat upon a defense motion at the conclusion of the government's case.

3. The charging practices in this case are not ones to be emulated. Three sets of additional charges were referred and joined with the original charges, without objection by the appellant, after arraignment. None were numbered as additional charges, forcing the parties to the trial to refer to them based on the dates on the charge sheets. The government repeatedly charged the same offense in two or more ways, for example, preferring charges of rape and an indecent act encompassing the same act of sexual intercourse. When charges were withdrawn or dismissed, the government made no effort to renumber the charges. Nearly seventy specifications were dismissed, by motion or otherwise, prior to entry of pleas; the government dismissed more than twenty additional specifications after entry of pleas. Fortunately, the confusion thus generated did not spill over to affect the court members. By the time the court was assembled, the flyer reflected properly numbered charges and additional charges. To aid the court members in following the testimony, the members were given a second flyer, grouping the specifications by the victim alleged.

legal and factual sufficiency of his rape, forcible sodomy, and indecent act convictions, and several of his indecent assault convictions, arguing that instructional errors, unfair pretrial publicity, and unlawful command influence caused the court members to convict him of rape and other nonconsensual sexual offenses, rather than the regulatory violations involving sexual activity to which he pled guilty. With the exception of all the nonconsensual offenses involving one alleged victim, and one indecent assault and portions of two other specifications involving a separate victim, we find the remainder of the appellant's findings of guilty to be legally and factually sufficient.

Part I of this opinion addresses issues pertaining to the pretrial motions involving unfair pretrial publicity, unlawful command influence, and an alleged violation of Article 25, UCMJ, 10 U.S.C. § 825.[4] Part II addresses the offenses in general. Part III addresses the allegation of instructional error and the legal and factual sufficiency of the remaining contested rape, forcible sodomy, indecent act, and indecent assault specifications. Part IV reflects our action on findings and the sentence.

## PART I. PRETRIAL MOTIONS

### A. FACTS PERTAINING TO PRETRIAL MOTIONS

Aberdeen Proving Ground, Maryland (APG), became the focus of a nationwide media blitz[5] on 7 November 1996, when military officials disclosed that two drill sergeants and one training company commander were under investigation for sexual misconduct with trainees. Press releases indicated that the appellant, one of the two drill sergeants mentioned by name, was in pretrial confinement and faced charges of rape, sodomy, and communication of threats involving several trainees.[6]

By the time that charges were preferred on 8 October 1996, the appellant, a thirty-one year old noncommissioned officer, had been a drill sergeant for eighteen months. Assigned first to B Company and later to A Company, 143d Ordnance Battalion, the appellant's duties involved supervision of soldiers attending advanced individual training (AIT) at the Army's Ordnance Center and School (OC & S).

Although the appellant was assigned to the OC & S, a subordinate unit of the Army's Training and Doctrine Command (TRA-

4. Of the two assignments of error pertaining to violations of Article 25, UCMJ, we have addressed only one—an allegation that the court members were selected in violation of Article 25(d)—in depth. The second issue, that the appellant failed to personally request trial by enlisted members either orally on the record or in writing, has been resolved by *United States v. Townes*, 52 M.J. 275, *cert. denied*, 531 U.S. 821, 121 S.Ct. 62, 148 L.Ed.2d 28 (2000). We are satisfied that the appellant, a staff sergeant with over twelve years of military service, understood the advice of the military judge about his forum options. While the military judge erred in failing to secure the appellant's personal election of enlisted members orally on the record or in writing, one of the appellant's three attorneys signed the written request for enlisted members on the appellant's behalf. The appellant was present during two days of voir dire, and throughout a trial that lasted several weeks. Had he not wanted to be tried by enlisted members, we are confident that he would have said so.

5. Four complete volumes of the appellant's record of trial consist of newspaper articles, editorials, editorial cartoons, press releases, transcripts of press conferences, interviews of senior military officials, letters from members of Congress, and similar materials pertaining to the so-called "Aberdeen sex scandal." Another volume contains hours of videotaped news reports and interviews with military officials, political commentators, and alleged victims of sexual abuse in the military. Although voluminous, many of the newspaper articles contained in the appellate exhibit are duplicated from wire service stories or editorial cartoons which were published in various newspapers across the country with little or no change in content from paper to paper. The vast majority of the press and video clips were dated between 7–22 November 1996. Although the pretrial publicity and unlawful command influence motions were litigated in late March and early April 1997, after early December 1996, the record, including the appellate exhibits, contain very few references to the "sex scandal" in general or the appellant's case in particular. While the nature and depth of the media coverage was extensive—even pervasive—for approximately one month, subsequent events in the appellant's case, including the referral of charges and his arraignment, apparently received significantly less notice.

6. The appellant was placed in pretrial confinement on 11 September 1996.

DOC), the general court-martial convening authority in the appellant's case was the commander of APG, Major General (MG) Longhouser. In addition to commanding APG, MG Longhouser also commanded the Army's Test and Evaluation Command (TECOM). Both APG and TECOM were subordinate units of the Army Materiel Command (AMC), which was commanded by General (GEN) Wilson. The OC & S commander, MG Shadley, was not a court-martial convening authority, although he exercised other command and control functions over personnel assigned to the OC & S.[7]

The investigation into sexual activity between cadre personnel and trainees at the OC & S began with a complaint by one trainee, Private E2 (PV2) EM, against the appellant.[8] An internal unit investigation uncovered complaints by several other trainees that the appellant had engaged in inappropriate contact with them. The investigation was widened when some trainees also claimed that the appellant's commander and another drill sergeant had committed similar offenses. In early September 1996, Criminal Investigation Command (CID) agents opened criminal investigations into the activities of appellant, the other drill sergeant, and the appellant's commander. Later, the investigation widened to include allegations against over twenty cadre members.

On 23 September 1996, based on the nature and extent of the criminal misconduct alleged by the trainees, MG Shadley mobilized a "Command Response Team" (CRT) comprised of various members of his command, as well as personnel from the installation staff and other tenant units. The group was established to monitor the progress of the investigation, to identify systemic causes of inappropriate relationships between trainees and cadre, and to take preventive action.

As the CID investigation widened,[9] members of the CRT and MG Shadley discussed the likelihood that the press would become aware that drill sergeants and other cadre were charged with or suspected of sexual misconduct with trainees. On or about 5 November 1996, MG Longhouser contacted the Chief of Public Affairs for the Army and recommended that the Army make a formal press release, through TRADOC, about the investigation. Inevitably, in MG Longhouser's view, given the number of alleged victims and witnesses, the investigation would become public knowledge. As he later testified, "Trainees will talk."

After consultation with GEN Hartzog (the TRADOC commander) and other high level officials within the Department of the Army (DA), including the Chief of Army Public Affairs, MG Shadley requested permission to make the investigation public. In two press conferences on 7 November 1996, GEN Reimer (the Chief of Staff of the Army), speaking from the Pentagon, and GEN Hartzog and MG Shadley, speaking from TRADOC headquarters, announced that an investigation into sexual abuse of trainees at APG was underway. Speaking to the press, MG Shadley announced that this mistreatment of trainees was "the worst thing I've ever come across" in thirty years of military service.

Subsequently, the Secretary of Defense, the Secretary of the Army, the Assistant Secretary of the Army for Manpower and Reserve Affairs, the Chief of Staff of the Army, and the Chairman of the Joint Chiefs of Staff, among others, made public statements regarding the investigation into sexual abuse of trainees, which had been widened to include all TRADOC installations.[10] A "hot-

---

7. *See* Army Reg. 27–10, Legal Services: Military Justice (8 Aug. 1994), TECOM Supp 1, app. F (30 Nov. 1994) (Appellate Exhibit LXXXII), which designates summary and special court-martial convening authorities within TECOM.

8. For reasons not clear from the record, all charges pertaining to PV2 EM were dismissed prior to assembly of the court.

9. Unless otherwise indicated, the term investigation in this opinion refers to the criminal investi-

gation, not the internal unit investigation. The CID Special Agent in Charge testified that during the investigation, the number of special agents on APG ranged from a low of six to over forty. Additionally, other agents were conducting interviews worldwide in response to APG's requests for assistance.

10. In *United States v. Ayers*, 54 M.J. 85, 92–94 (2000), our superior court summarized the pretrial publicity and public statements generated as a result of the press releases. Their summary of events and statements is consistent with the volu-

line" that permitted individuals who believed they had been victims of sexual abuse to make complaints or reports generated thousands of telephone calls in its first week of existence, and identified problems at installations other than APG.[11]

The Article 32, UCMJ, hearing into the appellant's original charges began on the same day as the press conferences. Comments and actions of MG Shadley during the investigation and CRT meetings raised concerns that his subordinates—the appellant's battalion and brigade commanders—might appear to have been improperly influenced.[12] Therefore, the appellant and other cadre members pending military justice action had been transferred from the OC & S to the garrison command at APG before preferral of any charges.[13] The original and three sets of additional charges were preferred and forwarded to MG Longhouser through the garrison chain of command.

General Longhouser first learned of the OC & S investigation and the appellant's pretrial confinement during a reception three hours prior to his assumption of command on 18 September 1996. His predecessor apologized for leaving him the "situation," while updating GEN Wilson (the AMC commander) on the investigation. Shortly after MG Longhouser assumed command, the installation staff judge advocate briefed him about the preferred charges and the status of the continuing investigation.

During the period between his assumption of command of APG and his testimony at the appellant's trial, MG Longhouser had several conversations with his commander, GEN Wilson, concerning the ever-expanding investigation.[14] The interview transcripts in the appellate exhibits and MG Longhouser's trial testimony are devoid of any suggestion, hint, or inference that GEN Wilson unlawfully pressured or influenced MG Longhouser's actions regarding the appellant during these conversations, which concerned administrative, rather than substantive aspects of the investigation.

While both GEN Wilson and MG Longhouser were aware that the Army leadership planned press conferences regarding the trainee abuse investigations, they were not present during the press conferences on 7 November 1996. Neither received any inquiry or influence from superiors in DA or the Department of Defense (DOD) with regard to MG Longhouser's decision to refer the appellant's case to court-martial.

The initial flurry of pretrial publicity abated within two to three weeks of the Army's press conference. When the appellant was arraigned, press coverage resumed. Members of the press were present in the court-

---

minous appellate exhibits in the appellant's case. One distinction, however, bears noting. In *Ayers*, the court referred to MG Shadley as "the Aberdeen commander." Major General Shadley was *an* Aberdeen commander, but was not the commander of APG, was not a convening authority, and made no recommendations concerning the disposition of the charges in this case.

11. Many of the press clippings and news reports contained in the appellate exhibits of this case concerned problems at installations other than APG. The guilty plea and sentencing of a Fort Leonard Wood, Missouri, drill sergeant occurred within a week of the press release concerning the appellant and others at Aberdeen and generated substantial media attention. Allegations of mistreatment of trainees at Fort Sam Houston, Texas; Fort Bliss, Texas; Fort Lee, Virginia; and an Air Force installation in San Antonio also received media attention.

12. Over a month prior to his public statements, MG Shadley sent a memorandum to subordinate commanders that, although withdrawn the same day, could have given the appearance of unlawful command influence. The appellate exhibits contain transcripts of interviews conducted by the trial defense counsel with the appellant's battalion and brigade commanders at the OC & S, who denied any actual attempt to influence their decisions regarding the appellant.

13. The garrison commander testified that she was unaware of the specific reasons the cadre members pending trial by court-martial were attached for military justice purposes to her command but that she thought it had to do with a perception of "undue command influence."

14. General Wilson also submitted to an interview by appellant's trial defense counsel and the military defense attorneys representing some of the other APG soldiers accused of misconduct with trainees. A transcript of that interview is also included in the appellate exhibits presented to the military judge in the litigation of the unlawful command influence, pretrial publicity, and violation of Article 25, UCMJ, motions. General Wilson did not testify at trial.

room on the date of his arraignment, and, although the record is less clear about press coverage of later events in the trial, members of the press were apparently present in subsequent Article 39(a), UCMJ, sessions and during the actual trial.[15]

Congressional interest in the APG investigation also generated considerable publicity. A congressional delegation visited APG and talked with a number of trainees. Several members of Congress made public statements demanding various actions on the part of military officials and debated whether Congress should mandate a return to single-sex initial entry training to preclude sexual activity among trainees and cadre members. Maryland Senator Mikulski sent sharply-worded letters to the Secretary of the Army and the Secretary of Defense demanding that the Army take action to "severely" punish wrongdoers. There was no evidence at trial, however, that her interest and demand were communicated to MG Longhouser, to anyone below him in the appellant's chain of command, or to the court members in the appellant's trial.

While the media feeding frenzy detailed in the record was long on rhetoric, it was short on details about the appellant or his case. The Army's initial press release disclosed the appellant's name, duty position, the charges,[16] and the fact that he was in pretrial confinement. *Cf.* Army Reg. [hereinafter AR] 25-55, Information Management: Records Management: The Department of the Army Freedom of Information Act Program (1 Nov. 1997); AR 27-26, Legal Services:

Rules of Professional Conduct for Lawyers (1 June 1992) (guidance on release of information about pending trials). An article in *The Washington Post*[17] provided substantial background material on the appellant's prior assignments and family situation, and included excerpts of interviews with the appellant's former commander and his high school football coach. A former girlfriend said that the appellant had earlier complained that "females were giving him a hard time," but said the appellant did not provide any details. In an interview reported in several newspaper articles, the appellant's mother claimed that her son had been set up and that someone was "trying to get him."

Private (PVT) JB, the alleged victim in several of the offenses, appeared on several talk shows and gave additional interviews, thereby providing the public with substantive details about the charges. The government dismissed all specifications involving PVT JB before the court was assembled, and the court members were not questioned about their possible exposure to PVT JB's statements.

In response to the widespread allegations of sexual abuse of soldiers, the Secretary of the Army created a Senior Review Panel to examine how the Army's leaders exercised their responsibility to prevent sexual harassment. The Chief of Staff sent a personal letter to all general officers reiterating the Army's position on sexual harassment, and he initiated a "Chain Teaching" program mandated to reach all active duty personnel.[18] General Longhouser began the chain

---

**15.** The military judge's findings of fact on the command influence and pretrial publicity motions reflected continuing media presence in the courtroom throughout the appellant's trial.

**16.** The public affairs office released a redacted version of the charge sheet containing the original charges in this case. The defense filed (and the government joined in) a motion for appropriate relief precluding the release of redacted versions of the three sets of additional charges to the media, based on the potential for adverse impact on the charges already referred to trial. The military judge granted the motion. Information released from subsequent charge sheets included a summary of the offenses, but not the level of detail provided in the specifications.

**17.** Jackie Spinner and Susan Levine, *Sex Scandal Derails Three Army Careers*, The Washington Post, November 17, 1996, at B1.

**18.** Neither "Chain Teaching" nor the Army's position on sexual harassment were new. Colonel (COL) Glantz, the garrison commander, testified that she had experienced chain teaching—a method by which senior leaders train subordinates, who then successively train their subordinates until the training materials reach the lowest echelons for which they are intended—since the beginning of her career almost twenty-five years earlier. The Secretary and Chief of Staff of the Army jointly issued a policy letter on sexual harassment in August 1995, over a year before the appellant became the subject of the criminal investigation that led to his court-mar-

teaching on APG. He testified that the chain teaching materials did not differ from earlier Army policy pronouncements on sexual harassment.[19] During voir dire, the court-martial panel members echoed his assessment.

The unlawful command influence and pretrial publicity motions were litigated four and a half months after the initial press conference. In the interim, the defense unsuccessfully sought from the military judge a gag order on public comment by DOD and DA officials.[20] The military judge did order all primary and alternate court-martial panel members to refrain from listening to, watching, or reading any radio, television, or news stories concerning the "Aberdeen sex scandal."

The defense was unable to produce any direct evidence of actual unlawful command influence. After two days of testimony about apparent unlawful command influence, the military judge denied the appellant's motions to dismiss the charges based on either unlawful command influence or unfair pretrial publicity. In an eight-page written ruling encompassing both findings of fact and conclusions of law, the military judge found that the appellant had failed to cognizably raise either actual or apparent unlawful command influence. In the alternative, he found that even if the defense had met its initial burden of production sufficient to shift the burden of persuasion to the government, the government had demonstrated by clear and convincing evidence that the proceedings were not tainted by either actual or apparent unlawful command influence.[21] He further found that the pretrial publicity did not affect the appellant's right to a fair trial.

When, shortly after assuming command, MG Longhouser selected a new standing court-martial panel to which charges could be referred, he was cognizant that this panel would probably hear any cases arising from the OC & S investigations. Aware that information about the investigations had permeated the OC & S, he deliberately excluded as members those nominated personnel who were assigned to the OC & S.[22] General Longhouser was concerned that personnel from the OC & S may have already formed opinions, for or against the cadre members under investigation. He testified that empanelling court members from the OC & S who had not been exposed to some information or rumor about the investigation, to those accused of offenses, or to potential witnesses would be difficult. He denied any intent to exclude former or present drill sergeants from the panel members selected, but felt that drill sergeants assigned to the school while the investigations were ongoing would be less than impartial. This deliberate exclusion of personnel from the OC & S is the basis of one of the appellant's assign-

---

tial. A copy of that policy letter is contained in the appellate exhibits in this case.

19. General Reimer's video and the briefing slides used in the chain teaching program on sexual harassment were not offered as exhibits.

20. Although the military judge declined to issue an order to DA and DOD officials to cease public comment on the sex scandal in general, the trial counsel advised the court that military officials were voluntarily refraining from further public comment on the investigations. With some limited exceptions, from 25 November 1996 onward, DA and DOD officials appeared to have honored the voluntary agreement. The appellate exhibits suggest that APG officials, including representatives of the staff judge advocate's office, had expressed concern to DA that the nature and extent of public comment might harm the ongoing criminal investigations and prosecutions.

21. This legal conclusion was erroneous in that it applied the wrong standard. When an issue of actual or apparent unlawful command influence is cognizably raised at trial, the government must establish beyond a reasonable doubt either that there was no unlawful command influence or that any unlawful command influence will not affect the proceedings. *United States v. Biagase*, 50 M.J. 143, 150 (1999). This case was tried two years before *Biagase* clarified that the standard was beyond a reasonable doubt instead of the clear and convincing evidence standard referred to in several earlier opinions. Because we review conclusions of law de novo, the military judge's use of the wrong standard is irrelevant to our review.

22. The OC & S was only one of fifty-eight tenant organizations on APG. The court member selection documents contained in the appellate exhibits reflect nominees in every rank from specialist to colonel and from fourteen different organizations.

ments of error alleging a violation of Article 25, UCMJ.

In his oral denial of the motion to dismiss based on unlawful command influence, the military judge stated, "Vigorous voir dire and liberal granting of challenges for cause can ensure the seating of a panel free of prejudice or bias." [23] He subsequently permitted that vigorous and extensive voir dire and liberally granted challenges for cause. During the two days of voir dire, both sides thoroughly explored the exposure of court members to media reports, the possible influence of superiors and friends, and the members' personal views on coeducational initial entry training.

Whether due to the earlier "gag order," a natural antipathy towards the news media, or some other reason, the court members indicated minimal contact with news reports about the "sex scandal" in general and the appellant in particular. While several court members had heard or read the appellant's name in news reports, only one member had read an article with more information than contained in the flyer. He recalled that the appellant was from North or South Carolina, but not much more. None had seen the Army leadership's interviews on various talk shows and none had seen the initial press conference itself, although several were aware that one had taken place. Most court members expressed considerable skepticism about the reliability and accuracy of media portrayals of events.

None of the court members shared the view of several members of the Army leadership that "there was no such thing as consensual sex between drill sergeants and trainees," perhaps reflecting a dichotomy between the leadership's prescriptive pronouncements and the court members' knowledge of human behavior. Likewise, none of the court members appeared improperly influenced by their recent exposure to "chain teaching" videos and classes on sexual harassment. Each member indicated that the content of the recent chain teaching was a reiteration of what they had previously understood Army policy to be. In extensive individual voir dire, each court member acknowledged his or her responsibility to decide the case based on the evidence and the judge's instructions, and denied feeling influenced or pressured to return any particular verdict or sentence based on the "zero tolerance" policy on sexual harassment.

Both of the appellant's challenges for cause were granted. One was based on the member's wife having had a professional disagreement with the appellant; the other was based on the member's fiancée's status as a victim of a rape nearly twenty years earlier. Other than the earlier challenge to the referral based on the exclusion of OC & S personnel from court membership, the defense made no motion to challenge the array.

## B. DISCUSSION

### 1. Unlawful Command Influence and Unfair Pretrial Publicity

The appellant contends that apparent unlawful command influence and unfair pretrial publicity permeated the proceedings in his case, thus depriving him of a fair trial. He seeks dismissal with prejudice of all charges and specifications as a remedy. We find that the appellant has failed to meet his burden to cognizably raise the issue or, alternatively, that he has failed to establish any nexus between the actions complained of and any unfairness in his trial, and decline to grant relief. Assuming, arguendo, that the appellant has met his burden and demonstrated nexus, we find beyond a reasonable doubt that his trial was untainted by unlawful command influence. We also find that his trial was unaffected by the pretrial publicity.

### a. Burden of Proof and Standard of Review

To cognizably raise the issue of unlawful command influence on appeal, "the

---

**23.** The military judge had earlier ruled on the pretrial publicity issue when he denied the defense request that he order DOD and DA officials to refrain from further public comment. The issue of pretrial publicity was also litigated in conjunction with the defense motion to dismiss the charges based on unlawful command influence. In effect, the defense argued that the pretrial publicity—and in particular the statements of top military leaders—constituted unlawful command influence.

defense must: (1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the cause of the unfairness." *Biagase*, 50 M.J. at 150 (citing *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A.1994)). Prejudice will not be presumed in the absence of evidence showing "proximate causation between the acts constituting unlawful command influence and the outcome of the court-martial." *Biagase*, 50 M.J. at 150; *see also United States v. Reynolds*, 40 M.J. 198, 202 (C.M.A.1994). Unlawful command influence is not cognizably raised until the defense meets its burden of production. *United States v. Ayala*, 43 M.J. 296, 299 (1995); *United States v. Francis*, 54 M.J. 636, 640 (Army Ct.Crim.App.2000).

■ Once the issue of command influence is cognizably raised, the government has the burden to "prove beyond a reasonable doubt: (1) that the predicate facts do not exist; (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence ... did not affect the findings and sentence." *Biagase*, 50 M.J. at 151. Proof beyond a reasonable doubt of any of these three factors is sufficient to rebut a prima facie case of unlawful command influence.

■ We review the military judge's findings of fact under a clearly erroneous standard. We review conclusions of law flowing from those facts de novo. *United States v. Ayers*, 54 M.J. 85, 95 (2000); *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A. 1994). Once raised by the evidence, the appearance or existence of unlawful command influence creates a rebuttable presumption of prejudice. *Wallace*, 39 M.J. at 286.

As evidence of his allegations that unlawful command influence permeated the court-martial process, the appellant cited, *inter alia,* the "zero tolerance" policy on sexual harassment; a chilling effect on the command decision-making process stemming from the Secretary of the Army's creation of a Senior Review Panel to examine gender relations within the Army; public statements by senior military officials suggestive of the appellant's guilt; public comments on the sex scandal in general by members of Congress [24] and military officials; the emotional reaction of senior military personnel in those public comments; the creation of, response to, and public comments about the DA hotline for reporting sexual harassment or abuse; and the Army's Chain Teaching program. Although the subject of a separate motion at trial, the issues of pretrial publicity were inextricably linked with the motion to dismiss all the charges and specifications based upon unlawful command influence. Accordingly, we will discuss these issues together.

### b. *The First Stombaugh–Biagase Factor: Actions That are Neither Unlawful nor Command Influence*

■ The appellant's initial burden is to show facts that, if true, constitute unlawful command influence. *Biagase*, 50 M.J. at 150; *see also Ayala*, 43 M.J. at 299. We hold that he has failed to meet even this threshold requirement with respect to several of his allegations. While the appellant established that the Secretary of the Army ordered the DA Inspector General to investigate command responsibility for the sex scandal and created the Senior Review Panel to examine issues of gender relations within the Army, neither action constitutes unlawful command influence. The Secretary's actions evinced a concern about the state of the Army stem-

---

24. Although the appellant contends that unlawful command influence may result from actions by members of Congress, we note that, by its terms, the Article 37, UCMJ, 10 U.S.C. § 837, proscriptions against unlawful command influence are limited to persons subject to the UCMJ. While actions by civilians not subject to the UCMJ may cause unlawful impact on those who are, *see, e.g., United States v. Doherty*, 5 U.S.C.M.A. 287, 17 C.M.R. 287, 1954 WL 2604 (1954), no military court has held that congressional action actually constitutes an Article 37, UCMJ, violation. We need not decide, however, if comments by members of Congress demanding swift and severe punishment for malefactors could constitute actual unlawful command influence, because we find no evidence that comments by Senator Mikulski and others were communicated to MG Longhouser, COL Glantz, the court members, or anyone else charged with making decisions regarding the appellant's charges.

ming at least partially from the charges in the appellant's case, but transmuting his appropriate concern and action into unlawful command influence requires alchemy the appellant does not possess.

■ The establishment of a "hotline" to facilitate reporting of sexual harassment or abuse did not constitute unlawful command influence. While it is possible that some of the additional charges in this case were the result of victims making hotline calls or being located by CID agents following up on such calls, we are unaware of any legal rule or precedent that would equate such proactive police techniques to unlawful command influence. There was absolutely no evidence suggesting that the hotline was established to target the appellant for prosecution or to manipulate the evidence against him.

Thus, we find that the appellant has failed to meet the first prong of the *Biagase* test with regard to the establishment of the Senior Review Panel, the directive to have the DA Inspector General investigate the sexual abuse of trainees, or the establishment of the hotline. *See United States v. Johnson*, 54 M.J. 32, 35 (2000).

### c. The Second and Third Stombaugh–Biagase Factors: Unfairness and Proximate Causation

In this case, the appellant's allegations are more vague and general than specific and focused. While he identifies certain actions by DOD and DA officials as evidence of unlawful command influence, he does not tie those actions to specific events, outcomes, or results at trial, alleging instead that the atmosphere was so poisoned that a fair result was unobtainable. *See Reynolds*, 40 M.J. at 202 ("The issue of unlawful command influence must be alleged with particularity and substantiation."). While "command influence in the air" is not generally a sufficient basis upon which to shift the burden of persuasion to the government, *Johnson*, 54 M.J. at 34 (quoting *United States v. Allen*, 33 M.J. 209, 212 (C.M.A.1991)), we recognize that the defense established both widespread publicity and forceful statements by high-ranking military leaders—each with the potential for impact on the proceedings. Accordingly, we will focus on the issue of proximate causa-

tion: what impact, if any, did these events have on events pretrial and at trial? "Influence in the air ... is a contradiction in terms. An object and effect upon the object must be identified for influence to exist." *United States v. Calley*, 46 C.M.R. 1131, 1160, 1973 WL 14570 (A.C.M.R.1973).

### "Zero Tolerance" Policy

Military appellate courts have long recognized the tension between ensuring a fair trial in a particular case and the need for command policies to address the discipline and morale problems from which the court-martial stems. As our superior court has noted, promulgation of command policies are a "proper exercise of the command function. What is improper is the reference to such policies before members which ... brings the commander into the deliberation room." *United States v. Grady*, 15 M.J. 275, 276 (C.M.A.1983).

■ The "zero tolerance" policy concerning sexual harassment was not improperly injected into the trial of this case. When the issue of the Army's policy toward sexual harassment was discussed with the court members during voir dire, the members displayed a sophisticated understanding that the policy was a matter of leadership, not law, which had no relationship to their duties as court members. No evidence about the policy was introduced at trial, and the trial counsel scrupulously avoided any references to the Army's policy on sexual harassment during argument. *Compare United States v. Kropf*, 39 M.J. 107, 109 (C.M.A.1994) (neither "clear" nor "obvious" that the argument on command policy infected the members' deliberations) *with United States v. Kirkpatrick*, 33 M.J. 132, 133 (C.M.A.1991) (judge's instructions concerning policy constituted plain error).

### Pretrial Publicity

Generally speaking, courts-martial have been relatively free of the pervasive publicity that often accompanies criminal investigations and trials in civilian communities, where details about specific crimes, victims, witnesses, and the evidence often appear in

broadcast and print media. In contrast, most military accused enjoy relative anonymity. *Cf.* AR 25–55; AR 27–26.

This case was one of the exceptions. Although the news media reported the appellant's name and the nature of the charges— including some of the acts alleged in the specifications—the pretrial publicity in this case was, in comparison to that found in many civilian criminal investigations, very sparse on details.

■■■■ Whether deliberately or inadvertently, pretrial publicity can make a fair trial impossible, when a "nexus between the community prejudice and jury prejudice" can be demonstrated. *Hale v. United States*, 435 F.2d, 737, 746 (5th Cir.1970); *see also United States v. Gray*, 51 M.J. 1, 27–28 (1999) (citing *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)), *cert. denied*, —— U.S. ——, 121 S.Ct. 1354, —— L.Ed.2d —— (2001). In some egregious circumstances, demonstrating actual prejudice is not required; the publicity and the lack of appropriate judicial response may themselves constitute a due process violation without a demonstration of nexus. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). When those with the mantle of command authority deliberately orchestrate pretrial publicity with the intent to influence the results in a particular case or series of cases, the pretrial publicity itself may constitute unlawful command influence. Even the perception that pretrial publicity has been engineered to achieve a prohibited end—regardless of the intent of those generating the media attention—may lead to the appearance of unlawful command influence.

■■■■ Conversely, however, pretrial publicity, in and of itself, is not a "get out of jail free" card. *See Calley*, 46 C.M.R. at 1156– 57. To prevail on a claim of unfair pretrial publicity, an appellant must show either a due process violation, or that the publicity rendered a fair trial impossible. *Id.* at 1143. This appellant has failed to carry that burden.

In *Calley*, this court considered the impact of massive pretrial publicity surrounding the My Lai massacre. Looking first at due process concerns, we concluded that the publicity itself was tempered by the appropriate actions of the military judge to limit the exposure of court members, his attempts to control the public statements of witnesses, and his firm control over the courtroom itself. We found no due process violation. Second, this court examined whether the type and quantity of publicity made a fair trial impossible, in spite of the military judge's efforts. *Calley*, 46 C.M.R. at 1145. While noting that the record contained tapes and transcripts of media reports, press releases and statements of government officials and members of Congress, interviews with prospective witnesses, comments by government officials about the court-martial itself, and references to remedial and investigative actions of the Army and Congress, we nonetheless declined to apply a presumption of prejudice. *Id.* at 1146. Instead, this court examined the trial itself to determine if the publicity created a community presumption of guilt or otherwise affected some aspect of the trial. We concluded that no nexus between the publicity and the trial results existed. *See also United States v. Curtis*, 44 M.J. 106, 139 (1996); *United States v. Rockwood*, 48 M.J. 501, 512 (Army Ct.Crim.App. 1998), *aff'd*, 52 M.J. 98 (1999), *cert. denied*, 528 U.S. 1160, 120 S.Ct. 1173, 145 L.Ed.2d 1081 (2000) (applying presumptive and actual prejudice tests to evaluate a claim of prejudicial pretrial publicity).

■■■■ We come to a similar conclusion in the face of similar evidence. Reviewing the entire record, we find no evidence of any community presupposition of guilt. The military judges, both those handling pretrial motions and the judge who presided over the trial and sentencing proceedings, took appropriate actions to control the impact of publicity on the proceedings. Contrary to the defense assertions at trial and on appeal, the vast majority of public statements of DOD and DA officials were balanced and fair. General Shadley's characterization of what the investigation had disclosed as the "worst thing I've ever come across" referred to the investigation in general; he did not link his comment to the appellant in particu-

lar. Likewise, comments by MG Shadley and Ms. Lister (the Assistant Secretary of the Army for Manpower and Reserve Affairs) to the effect that there was no such thing as consensual sex between a drill sergeant and a trainee did not establish a rule of law in this or any other case. The court members stated their disagreement with this public pronouncement, and there is nothing in the record to suggest that their findings were influenced by it.

Pieced together from the news clippings, videotapes, and witnesses at the appellant's trial, the picture that emerged of the training environment at APG and elsewhere in TRADOC prior to this trial was frankly appalling. The Army's youngest and most vulnerable members—those undergoing the difficult transition from civilian to soldier—were being preyed upon by those charged with training and leading them. Trainee abuse in the military is certainly not new. Since the infancy of the UCMJ, prosecutions of drill sergeants soliciting funds and favors from their subordinates have occurred. *See, e.g., United States v. Bey,* 4 U.S.C.M.A. 665, 16 C.M.R. 239, 1954 WL 2447 (1954) (involving the sale of passes to trainees); *United States v. Wiley,* 16 U.S.C.M.A. 449, 37 C.M.R. 69, 1966 WL 4609 (1966) (involving the sale of barracks supplies to trainees); *United States v. Tenney,* 15 M.J. 779 (A.C.M.R.1983) (soliciting and borrowing money from trainees). Sometimes the trainees were willing participants. *See, e.g., United States v. Hoard,* 12 M.J. 563 (A.C.M.R.1981) (drinking, socializing, and having consensual sexual intercourse with trainees). The evidence in this case demonstrates that some trainees were willing participants in, and sometimes the actual initiators of, sexual activity with the appellant and other cadre members from the OC & S.

Faced with evidence that the safeguards and regulations against unnecessary contact among trainees and drill sergeants were being systemically ignored, the Army leader-

ship chose to act.[25] We decline to further speculate on the concerns that led senior DOD officials to respond as they did. Whatever their motivations, senior officials must recognize that when they do comment in such an extensive manner while criminal investigations and courts-martial are pending, they place an enormous strain on the ability of the military justice system to provide accused servicemembers fair and impartial trials. No one case, no matter how notorious, is as important as maintaining the integrity of the military justice system as a whole. Nevertheless, in the appellant's case, we find absolutely no evidence that the press conference itself, the subsequent public pronouncements of high-ranking military officials decrying sexual victimization of military women, or the media coverage of the investigation and trial were orchestrated by anyone to influence or bring about a particular result in the appellant's court-martial and not a scintilla of evidence that they actually had such an effect.

We recognize the tension between corrective action by military leaders and the possible impact on an accused soldier's right to a fair trial. Anytime a senior military official makes a public statement on a pending investigation or court-martial, he or she must be cognizant of the risk that such statements may be misinterpreted as an attempt to influence the outcome of the investigation or trial. In our opinion, some statements—such as MG Shadley's characterization of the investigation as the "worst thing" he had encountered in his career and the statements by several officials that consensual sex could not exist between a drill sergeant and a trainee—stepped over the line. While we find no nexus between those statements and any aspect of this court-martial, such statements are fraught with risk. Senior leaders and the lawyers who advise them must carefully consider the potential for apparent unlawful command influence each and every time they

25. References in the record of trial note that surveys of Army personnel taken before the investigation in this case began disclosed that in one year, 55% of Army women reported being subjected to sexual harassment in some form, ranging from inappropriate remarks to assaultive behavior. While the number itself is large, the survey did not include a comparison with civilian women of similar ages employed outside the home. The Army fared the second worst of all the services in the numbers of women who claimed to have been sexually harassed, surpassed only by the Marine Corps.

comment on a pending case and determine if the comments are worth the risks.

### d. Command Influence in the Charging and Referral Process

 Unlawful command influence may affect one or more aspects of the court-martial process. It may impact on the so-called accusatory stage: the decision to charge and the determination of what charges are preferred. It may also impact on the decision to refer charges to trial and the level of court-martial involved. Preferral and referral decisions are inextricably tied to the exercise of command discretion. While command influence at any stage is abhorrent, demonstrating a nexus or causal connection between the unlawful influences alleged and the command discretion exercised is very difficult, absent testimony or other evidence that, but for the pressure exerted, someone would not have preferred, forwarded, or referred charges. While we recognize that command influence may exist in the accusatory phase of trial, we find no causal link in the appellant's case between the pretrial publicity or public pronouncements and the charges ultimately referred to trial.

The original charges were preferred nearly a month prior to the press conferences announcing the investigation into sexual abuse of trainees. They, and the three sets of additional charges, were all preferred outside of the OC & S chain of command. There was no evidence that the Article 32, UCMJ, hearing was tainted in any way by the subsequent publicity.[26] Absent good cause shown, Article 32, UCMJ, hearings are open to the public, *ABC, Inc. v. Powell,* 47 M.J. 363, 365 (1997), and press coverage of such hearings may ensue.

To the extent the evidence of pretrial publicity about the appellant's case and public statements and actions of military officials regarding the appellant or the APG "sex scandal" may have raised the issue of apparent unlawful command influence, we find no nexus between the publicity and statements and the decision to refer the appellant's case to trial by general court-martial. As the recitation of the charged offenses in the initial paragraphs of this opinion amply demonstrates, the appellant faced very serious allegations of sexual offenses with multiple victims. Standing alone, even the consensual sexual offenses with trainees, given the number of women and the time periods involved, fully warranted trial by general court-martial.

The unrebutted testimony of Colonel (COL) Glantz (the special court-martial convening authority) and MG Longhouser demonstrate that the appellant's case received careful, individual consideration. General Longhouser's decision was properly based on the severity of the charges, not on any outside pressures.

Indeed, the record reflects that MG Longhouser and COL Glantz did not react in a "knee-jerk" fashion when presented with allegations of trainee abuse arising out of the sex scandal investigation. Some cadre members received nonjudicial punishment. Where court-martial charges were preferred, some cases were disposed of by discharges in lieu of courts-martial. Still others were referred to special courts-martial. Significantly, in the case of Staff Sergeant Beach, one of the three soldiers mentioned—including the appellant—in the initial press releases and news stories, MG Longhouser withdrew the charges and returned the case to COL Glantz for disposition at her level. Sergeant Beach subsequently received nonjudicial punishment.

Based on this record, we find no nexus between the purportedly unlawful or unfair actions of senior military officials and the convening authority's decision to refer this case to a general court-martial.

### e. Command Influence on the Trial Itself

 The potential for unlawful command influence affecting the outcome of the trial itself is most apparent when it impacts on the truth-finding aspects of a trial. When witnesses testify falsely against an accused because they fear command retaliation or fail to testify on an accused's behalf based on similar fears, unlawful command influence truly becomes military justice's "mortal enemy."

---

26. Only one Article 32, UCMJ, investigation hearing occurred. The appellant waived his right to an Article 32, UCMJ, investigation on each of the three sets of additional charges.

*United States v. Thomas*, 22 M.J. 388, 393 (C.M.A.1986); *see also United States v. Levite*, 25 M.J. 334, 340 (C.M.A.1987) (tampering with defense witnesses before and during trial constituted unlawful command influence). Similarly, when court members rush to convict, in spite of the weight of the evidence, or sentence harshly without regard to the evidence presented in extenuation and mitigation, as the result of unlawful command influence, the military justice system fails to render justice.

▪ Voir dire of the court members did not reflect any influence on them by the public statements of high-ranking military officials.[27] As our court noted in *Calley*, we need not accept their "self-proclaimed impartiality" as determinative of this issue, but we may do so in the absence of a showing of some impact. 46 C.M.R. at 1160–61. During extensive voir dire, the court members all credibly disavowed exposure to most of the publicity reflected in the appellate exhibits. However, all but one member acknowledged receiving the Army's "chain teaching" instructions on sexual harassment in the months immediately preceding the appellant's trial.

The record does not reflect the content of the chain teaching instruction, but each court member indicated that the instruction he or she received did not differ from what they previously understood Army policy to be. In view of the vigorous defense mounted by the appellant's three counsel in pretrial motions and at the trial itself, we are confident that if the chain teaching materials carried any express or implied message that the appellant should be found guilty without regard to the evidence or that he should be sentenced severely, they would have presented such evidence at trial. We will, therefore, take the court members' disavowal of any influence from the chain teaching program at face value. *Cf. United States v. Martinez*, 42 M.J. 327, 332 (1995).

▪ The mere fact of a conviction or of a lengthy sentence does not establish a cause and effect relationship with unlawful command influence. In the appellant's case, we find no evidence whatsoever that any witnesses testified falsely or failed to testify at all because of influence by superiors or the publicity in this case. *Cf. United States v. Drayton*, 45 M.J. 180, 182 (1996). Publicity or the hotline may have led, directly or indirectly, to witnesses being located, but that does not equate to false or manufactured testimony.

We likewise find no evidence that the court members were influenced to return guilty verdicts because that is what the Army or their superiors wanted. Our review of the court members' frequent questions for witnesses during the trial disclosed no prosecutorial bias. The court members deliberated on findings for nearly thirty hours over a period of five days. During those deliberations, they requested that some evidence be repeated. They returned verdicts of not guilty to several offenses, although the government established at least a prima facie case for each of those specifications. Their sentence was considerably less than the maximum confinement—life imprisonment—for the offenses of which they convicted the appellant, and might be considered lenient in many jurisdictions for a serial rapist convicted of eighteen rapes. Had the results of this trial been preordained by command pressure, one might expect that the court members would have questioned and deliberated far less and sentenced far more harshly.

### f. Conclusion

We hold that the appellant has failed to establish a prima facie case of unlawful command influence or unfair pretrial publicity. To whatever extent he may have met the first prong of the *Stombaugh–Biagase* test for raising unlawful command influence, he has failed to demonstrate any nexus between the acts complained of and any unfairness in his trial—prongs two and three of *Stombaugh*. 40 M.J. at 213. Assuming, arguen-

---

**27.** This lack of influence can be read at least two ways. First it may, ironically, reflect the ineffectiveness of the Army leadership's influence on the APG military community. On the other hand, it may demonstrate the leadership's intent to reach the general public, rather than soldiers and subordinate Army leaders, in an effort to buttress or restore public confidence in the Army as an institution. We presume, without deciding, that the leadership possessed the later intent.

do, that the appellant has cognizably raised the issue of unlawful command influence, we find beyond a reasonable doubt that the allegations made do not constitute unlawful command influence and that the findings and sentence were unaffected by any of the actions of which he complains. *See Biagase,* 50 M.J. at 150. As Judge Gierke noted in his dissenting opinion in *Reynolds,* 40 M.J. at 206: "Courts-martial must not only be fair; they must appear to be fair." We are satisfied that the appellant's trial was fair and that the record dispels any perception of unfairness stemming from the pretrial publicity.

## 2. Article 25, UCMJ, Exclusion of Court Members

The appellant contends that the convening authority's deliberate exclusion of personnel assigned to the OC & S from the court-martial panel that heard the appellant's case violated Article 25, UCMJ. We disagree.

■■■ Whether this systematic exclusion of potential court members based on unit of assignment violates Article 25, UCMJ, is a question of law, which we review de novo. *United States v. Kirkland,* 53 M.J. 22, 24 (2000). The burden of establishing an improper selection of court-martial members is on the accused. *United States v. Roland,* 50 M.J. 66, 69 (1999).

While the standard of review on a question of law is de novo, we will not disturb the factual findings of the military judge unless we find them to be clearly erroneous. *Ayala,* 43 M.J. at 298. In this case, we adopt the factual findings of the military judge as our own. Stated concisely, the military judge found that the convening authority was aware of the Article 25(d)(2), UCMJ, criteria for selecting court members, that he applied the criteria in selecting the members who heard the appellant's case, and that his intent in excluding OC & S personnel was to obtain an unbiased and objective panel. The military judge noted that the defense had failed to establish any improper motive or intent by MG Longhouser in making the court member selections, and had conceded in argument that the convening authority was well-intentioned in this systemic exclusion.

The practical effect of MG Longhouser's exclusion of OC & S personnel was that no current drill sergeants or other training cadre members sat on the appellant's court-martial panel, although MG Longhouser disavowed any intent to exclude present or former drill sergeants as a class. Since his exclusion of all OC & S personnel from court-martial membership also excluded officers, noncommissioned officers who were not drill sergeants or instructors, and junior enlisted personnel from that unit, we find no intent to eliminate drill sergeants from the panel that heard appellant's case based solely on their status as drill sergeants. As there is no right in the military justice system to a jury of one's peers, their exclusion, standing alone, would not constitute an Article 25, UCMJ, violation. *See United States v. Lewis,* 46 M.J. 338, 341 (1997).

However, certain systemic exclusions of classes of persons from court-martial duty may be unlawful as violative of either constitutional protections or Article 25, UCMJ. *See, e.g., Kirkland,* 53 M.J. at 25 (holding that "an unresolved appearance that potentially qualified court members below the grade of E–7" were excluded from selection warranted reversal); *United States v. McClain,* 22 M.J. 124, 132 (C.M.A.1986) (holding that deliberate exclusion of junior personnel because of a belief that they would adjudge lighter sentences was improper); *United States v. Daigle,* 1 M.J. 139, 141 (C.M.A.1975) (finding a fixed policy of excluding lieutenants and warrant officers from selection invalid).

■■■ Court "stacking"—the deliberate inclusion or exclusion of members to achieve a desired result—is impermissible. *United States v. Upshaw,* 49 M.J. 111, 113 (1998). Court stacking is a form of unlawful command influence, but not all systemic inclusions or exclusions constitute unlawful court stacking. *See Lewis,* 46 M.J. at 341. The motive of the convening authority in the systemic inclusion or exclusion is critical. *See McClain,* 22 M.J. at 132. Thus, our superior court has indicated that it would be proper for a convening authority to consider race, ethnicity, or gender in making court member selection, when the motive for doing so was

to include such members as important segments of the military community. *United States v. Smith*, 27 M.J. 242, 249 (C.M.A. 1988). The court has emphasized, however, that the convening authority's intent is crucial in determining whether such selections constitute court stacking. *Id.* If the members are deliberately selected to achieve a particular outcome, their selection violates Article 25(d)(2), UCMJ.

█ In this case, the record is devoid of evidence that MG Longhouser had any improper motive when he excluded personnel assigned to one of his many tenant units from court-martial duty. His exclusion was logically based on his knowledge of the scope of the investigation into sexual misconduct among trainees and cadre members at the OC & S and the difficulty presented in finding court members from that unit who were not tainted by prior exposure to the investigation, those accused, or the witnesses.

While the appellant cites an earlier opinion of this court, *United States v. Autrey*, 20 M.J. 912 (A.C.M.R.1985), for the proposition that deliberate exclusion of court members based on their potential disqualification is impermissible, we find *Autrey* limited by subsequent opinions of our superior court. *Autrey* was decided before our superior court held that the intent of the convening authority is a critical factor in analyzing any systemic inclusion or exclusion of potential court members. To the extent that *Autrey* can be read to invalidate the exclusion of a class of individuals likely to have personal knowledge of the accused or witnesses or previous exposure to the subject matter of the charges, we decline to follow it.

In contrast to the conclusory testimony in *Autrey*, MG Longhouser had actual knowledge of the breadth of the investigations at the OC & S. Published interviews with trainees and cadre members suggested that some had already taken sides for or against the drill sergeants accused of offenses. Actions

by the OC & S commander had created a sufficient potential unlawful command influence issue to cause the appellant and others under investigation to be attached to the garrison command to ensure unbiased recommendations on disposition of charges. Under these circumstances, we find good judgment, not error, in MG Longhouser's decision to exclude OC & S personnel of all ranks from the court-martial panel likely to hear cases arising from the OC & S investigation.

We hold that the appellant failed to establish an improper motive in MG Longhouser's exclusion of OC & S personnel from court-martial membership, and thus has failed to demonstrate "unlawful court packing," *United States v. White*, 48 M.J. 251, 254 (1998). Assuming, arguendo, that the threshold requirements of unlawful court packing were met, we are convinced beyond a reasonable doubt that the court members were properly and lawfully selected. *See Lewis*, 46 M.J. at 341.

## PART II. THE OFFENSES IN GENERAL

During his eighteen months as a drill sergeant, the appellant engaged in a pervasive array of sexual misconduct. Whether merely availing himself of willing sexual partners among the trainees in his charge, as his guilty pleas admitted,[28] or using the power and authority of his position to force sexual activity with the young women he supervised, as their testimony abundantly established, the record clearly reflects that the appellant was a sexual predator.

On appeal, the appellant challenges the legal and factual sufficiency of the following twenty-seven convictions pertaining to six different victims:

| Victim [29] | Offenses | Number of Specifications |
|---|---|---|
| Private First Class (PFC) PR | Rape Forcible sodomy | Eight One |

---

28. At the appellant's request, the military judge informed the court members of the appellant's guilty pleas to sixteen specifications of violating OC & S Reg. 600–2. These pleas included the appellant's admission to having sexual intercourse with five of the six trainees whom he was charged with raping, and the military judge further properly advised the court members that the appellant's pleas established one of the two elements of rape of these five trainees.

29. For consistency, we will refer to all victims by their rank at the time of trial.

| | | |
|---|---|---|
| | Indecent assault | Four |
| PFC KG | Rape | One |
| | Indecent assault | Two |
| PVT BT [30] | Rape | Five |
| | Indecent acts | One |
| PVT JW | Rape | Two |
| | Indecent assault | One |
| Specialist (SPC) SP | Rape | One |
| RS | Rape | One |

To summarize the appellant's legal and factual sufficiency arguments, he alleges: (1) that the evidence failed to prove beyond a reasonable doubt that the alleged rapes and sodomy were accomplished by actual or constructive force; (2) that the evidence failed to prove beyond a reasonable doubt that the alleged rapes, indecent acts, and indecent assaults were accomplished without consent; (3) that the government failed to rebut the appellant's mistake of fact defense beyond a reasonable doubt; and (4) that the testimony of several of the victims was not credible. To put the appellant's legal and factual sufficiency challenge in perspective, we will first briefly discuss the evidence as a whole.

## A. BACKGROUND

Evidence adduced at trial established that the appellant was six feet, four inches tall and physically imposing. One trainee testified that, with his distinctive drill sergeant hat, the appellant seemed to be "about seven feet tall." His reputation throughout the battalion was that of a stern disciplinarian. He referred to himself as "the company asshole." The appellant's former company commander testified that the appellant got things done by scaring "the living shit" out of people. The appellant generally carried a knife and frequently showed it to trainees.

Notwithstanding the appellant's reputation as a tough drill sergeant, many of the trainees were very loyal to him. He took a personal interest in the trainees, asking them questions about their personal lives, and, at times, permitted trainees to congregate in his office for informal "bull" sessions.

The 143d Ordnance Battalion, where the appellant and the trainee-victims were all assigned, consisted of three companies. Trainees included recent arrivals from basic training installations as well as soldiers with more military experience who were reclassifying into an ordnance military occupational specialty (MOS). Their length of stay was determined by the MOS course they were attending and their own mastery of both general soldier skills and MOS competence. Trainees could be "recycled" from one AIT class into another for academic deficiencies or physical problems that precluded completion of course requirements.[31]

New trainees were "on Gateway," a program designed to transition trainees from the near-total control exercised over them by cadre members while in basic training to the greater individual responsibility exercised by soldiers after assignment to a permanent duty station. The basic premise of the Gateway program was that the trainees were still undergoing the sometimes difficult transition from civilian to soldier. While "on Gateway," trainees were largely restricted to the battalion area. They were not allowed to wear civilian clothes when off duty, were not given off-post pass privileges, and were not ordinarily granted leave.

Understandably, getting "off Gateway" was a significant milestone, and one eagerly sought by the trainees. The drill sergeants generally determined when a soldier was "off Gateway," either directly or through recommendations to the company first sergeant. Unlike basic training where drill sergeants were responsible for virtually all the training received, in AIT the drill sergeants' duties were more limited. Instructors, not drill sergeants, provided the MOS-related training. Drill sergeants were largely occupied with physical training, teaching common skills, barracks life and inspections, and in

---

**30.** The appellant has not challenged his conviction of indecently assaulting PVT BT by slapping her in the face with his penis.

**31.** Our sister service court has noted the "awesome" power of a threat to recycle a trainee, commenting, "To anyone who has been through [initial entry training], the terror inspired by the threat of having to go through it again is very real." *United States v. McCreary*, ACM, 30753, 1995 WL 77637, 1995 CCA LEXIS 84 (A.F.Ct. Crim.App. 15 Feb. 1995) (unpub.).

getting the trainees to and from class, medical appointments, and other administrative appointments. Drill sergeants exercised considerable control over the trainees' lives, particularly for those soldiers still "on Gateway" and thus largely restricted to the barracks.

During drill sergeants' school, drill sergeant candidates role-played scenarios involving trainees, some of which included trainees who sought more than professional contact with their drill sergeants. The training included a discussion of appropriate responses. Each newly graduated drill sergeant assigned to the 143d Ordnance Battalion received a briefing on OC & S Reg. 600–2 and its prohibitions against cadre-trainee social contact.

### B. OFFENSES WITH TRAINEES THAT DID NOT CULMINATE IN RAPE CHARGES

In spite of his training, the appellant began a pattern of seeking sexual gratification from the trainees whom he supervised in his first AIT class after signing into B Company, 143d Ordnance Battalion. The first charged social contact with a trainee involved the appellant soliciting PVT AS to get a hotel room with him and telling her to report to his office wearing a physical training (PT) uniform without underwear.[32] During the same general time period, the appellant indecently assaulted PFC SS, a holdover trainee,[33] by trying to stick his hand down her sweatpants after stopping her for running on the barracks stairs. The charged rape of SPC SP occurred during this same time frame.

During the spring through fall of 1995, the appellant had consensual sexual intercourse with five trainees. One of these women, TB–C, testified for the defense that she had consensual sexual intercourse with the appellant because he was "cocky and challenging."

After she decided to end the relationship, he never pressed her for sex again. The appellant also solicited dates with two other trainees, AM[34] and PFC TB. The appellant pled guilty to the offenses involving these seven trainees.

His conduct during this period also included nonconsensual contact with trainees. He tried to kiss PFC JV and asked her to permit him to perform oral sodomy on her. He told SPC IH that she was attractive, and some two months later, while she was alone in the barracks, grabbed her and kissed her on the mouth. After SPC IH pushed him away and gave him a dirty look, he desisted.

The appellant asked PFC SM to have sex with him. After telling the appellant she was not interested and that he was out of line for asking, she tried to avoid contact with the appellant, fearing some form of retaliation for her refusal. She joined the softball team to avoid being in her barracks, where the appellant's office was located. She also began spending time in another company's barracks to minimize the appellant's access to her. On one occasion, however, the appellant called her to his office alone, and while she was standing at parade rest in front of his desk, he attempted to kiss her. Thereafter, PFC SM would not go to his office alone. However, when she was alone with the appellant in a car en route to a dental appointment, he placed his hand on her knee and asked why she was not attracted to him. The final episode with PFC SM took place at the class dinner where the trainees were celebrating their graduation. During the dinner, the appellant leaned over and graphically told PFC SM that he wanted to perform oral sodomy on her. She never reported any of these incidents until contacted by CID. She explained that the unit equal opportunity officer was Drill Sergeant (DS) Cross, a close friend of the appellant's.[35]

---

**32.** The appellant entered a guilty plea to this offense.

**33.** Holdovers are trainees who have completed their MOS training, but who, for a variety of reasons, have not yet departed for their new duty station. The prohibitions on social contact between trainees and cadre members in OC & S Reg. 600–2 defines holdovers as trainees.

**34.** The record does not reflect what rank some of the trainees held at the time of the offenses. Presumably these trainees were no longer on active duty at the time the charges were preferred.

**35.** Evidence from one witness suggested that DS Cross and the appellant were engaged in a contest to see who could have sex with the most trainees. Other witnesses admitted engaging in consensual sexual contact with DS Cross.

During the summer months of 1995, the appellant directed DW, then a trainee, to report to his office at 2000 hours on a Friday evening. When she asked him why, he threatened to "smoke" her.[36] She reported as ordered, but the appellant was not there and she left. The following Monday, the appellant asked why she had not reported as ordered and directed her to report to him after school. While she was standing in front of his desk, the appellant asked her if she wanted to "get with him." She interpreted this as a sexual solicitation and declined. The appellant persisted and told her she could receive a promotion and unspecified privileges if she would have sex with him. While his solicitation made her angry, she did not report it until approached by CID agents over a year later.

The appellant was acquitted of all nonconsensual sexual offenses involving yet another trainee, HN, during this same time frame, although the court members convicted him of wrongfully socializing and engaging in physical contact with her in violation of OC & S Reg. 600–2.

## C. TIMING OF THE RAPE OFFENSES

As noted previously, the charged rape of SPC SP occurred early in the appellant's tenure as a drill sergeant. Nine of the other charged rapes, involving two different trainees (PFC PR and RS), allegedly occurred during the late summer and early fall of 1995. The facts regarding these offenses will be discussed below. A military police investigation triggered by PFC PR's assault complaint against the appellant, made weeks after and without reference to the charged rapes, resulted in the appellant's rehabilitative transfer from B Company to A Company, 143d Ordnance Battalion. For a period of approximately six months thereafter, the appellant did not engage in any sexual misconduct with trainees.

In the summer of 1996, after a change in A Company's leadership, the appellant resumed his sexual exploits with trainees. He had consensual sex with one trainee, TS. The

remainder of the charged rapes stemmed from his sexual activities with three trainees, PVT BT, PVT JW, and PFC KG. After PVT JW and other trainees brought the appellant's sexual activities to the attention of his chain of command, the appellant was placed in pretrial confinement on 11 September 1996.

## PART III. LEGAL AND FACTUAL SUFFICIENCY CHALLENGES

### A. STANDARD OF REVIEW

When reviewing a case for legal sufficiency, the standard of review is whether, viewing the evidence in a light most favorable to the prosecution, any rational fact finder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Reed,* 54 M.J. 37, 41 (2000), *cert. denied* 531 U.S. 1080, 121 S.Ct. 780, 148 L.Ed.2d 677 (2001); *United States v. Arab,* 55 M.J. 508, 515 (Army Ct.Crim.App.2001). On the other hand, when testing for factual sufficiency, this court must, after weighing the evidence and making allowances for not having seen the witnesses in person, be convinced that an accused is guilty beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324 (C.M.A. 1987); *United States v. Scott,* 40 M.J. 914, 917 (A.C.M.R.1994), *aff'd,* 42 M.J. 457 (1995).

### B. THE SUBSTANTIVE LAW OF RAPE

Despite its often vile nature and profound consequences, rape is a deceptively simple crime, with only two elements: (1) an act of sexual intercourse; (2) done by force and without the consent of the victim. *See Manual for Courts–Martial, United States,* (1995 ed.), Part IV, para. 45b(1) [hereinafter *MCM*]. Practically speaking, however, rape is often a complex offense because of the interrelationships among the legal concepts of force, resistance, consent, and mistake of fact.

---

**36.** Various trainees used the term "smoke" to describe being disciplined by a drill sergeant. Being "smoked" involved being verbally chastised and being ordered to perform physical activity, such as push-ups.

Unlike sexual assault offenses in many civilian jurisdictions, the UCMJ does not subdivide the crime of rape based on the conduct involved or the nature of force employed.[37] In the federal civilian system, for example, crimes such as aggravated sexual abuse (18 U.S.C. § 2241) and sexual abuse (18 U.S.C. § 2242) have replaced the former federal rape statute (18 U.S.C. § 2031). *See* P.L. 99–646 § 87(b), 100 Stat. 3620. Under the current statutes, aggravated sexual abuse involves the use of actual force or threats or fear of death, serious bodily injury, or kidnapping to accomplish a sexual act. Sexual abuse involves similar sexual acts accomplished by threats or fear of a lesser degree of injury.

In contrast, Article 120, UCMJ, requires that an act of sexual intercourse be accomplished by force, but does not further define the degree or nature of the force required. Although the 1951 *MCM* indicated that the force used in achieving penetration was sufficient to constitute the crime of rape when there was no consent,[38] subsequent decisions of our superior court questioned whether that explanation of the necessary degree of force comported with the statutory requirement. In *United States v. Henderson*, the court noted that paragraph 199a also reflected that "[m]ere verbal protestations and a pretense of resistance are not sufficient to show want of consent." 4 U.S.C.M.A. 268, 274, 15 C.M.R. 268, 274, 1954 WL 2287 (1954). In that case, the court held that the use of paragraph 199a's "questionable instructional phrasing" did not warrant reversal, because the court members were informed that the victim must have "taken such measures to frustrate the execution of her assailant's design as she is able to take under the circumstances." *Id.* at 274.

As the court noted in *Henderson,* the law once required "resistance to the uttermost" on the part of a victim before a rape conviction would be sustained. 15 C.M.R. at 273. Declining to adopt this outmoded rule, the

court discussed three aspects of force, resistance, and consent that are still applied in military jurisprudence. First, required force may be actual, constructive, or a combination of the two. Second, the totality of the circumstances surrounding the offense will be considered in deciding "evidential sufficiency." Third, the degree of force required to overcome resistance must be measured with reference to "the mind of the victim." *Id.*

Subsequent editions of the *MCM* did not include the "questionable" phrase regarding the degree of force required. The 1969 *MCM* provided that force was indispensable to the offense, but, in the absence of consent, the force involved in penetration would suffice if resistance would have been futile, or the victim's resistance was overcome by threats of death or great bodily harm, or if the victim was incapable of consenting. *MCM*, 1969, para. 199a.

The concept of constructive force now recognized as applicable in the military crime of rape thus has its basis in our early jurisprudence. Constructive force has always included those victims rendered incapable of giving consent due to physical or mental infirmities, such as unconsciousness or severe mental retardation. *See United States v. Short*, 4 U.S.C.M.A. 437, 16 C.M.R. 11, 1954 WL 2421 (1954); *United States v. Williamson*, 24 M.J. 32 (C.M.A.1987). Constructive force may also consist of express or implied threats of bodily harm. *United States v. Hicks*, 24 M.J. 3, 6 (C.M.A.1987); *United States v. Lewis*, 6 M.J. 581 (A.C.M.R.1978). What else may constitute constructive force has been further refined by military court decisions.

In *United States v. Palmer*, 33 M.J. 7, 9–10 (C.M.A.1991), the Court of Military Appeals recognized that the moral, psychological, or intellectual force a parent exercises over a child may demonstrate sufficient force, but declined to adopt a per se rule that sex between a parent and child always consti-

---

**37.** *See, e.g., Mich. Comp. Laws Ann.* §§ 750.520b–e (West 1985); *Wis. Stat. Ann.* § 940.225 (West 1982). The *Model Penal Code* divides rape into three separate levels: a first degree felony when serious bodily injury is inflicted or when the accused and the victim have no prior social relationship; a third degree felo-

ny when the victim submits because of threats; and a second degree felony when the accused's conduct falls between the other two.

**38.** *See MCM,* 1951, Part IV, para. 199a.

tutes rape. *Cf. United States v. Henry,* 53 M.J. 108, 110 (2000). In *Hicks,* 24 M.J. at 6, the same court ruled that a coercive atmosphere, including threats to injure others or telling the victim that resistance would be futile, coupled with actual fear of bodily harm,[39] would constitute legally sufficient force under Article 120, UCMJ, notwithstanding the victim's complete lack of physical resistance.

Similarly, in *Bradley,* 28 M.J. at 200, our superior court noted that the military relationship between the trainee-husband of the victim and the accused (the husband's drill sergeant), coupled with other manifestations of the accused's status and power and the isolated locale of the rape, constituted "sufficient evidence of an implied threat of death or bodily harm."

■ Finally, in a case with some factual parallels to the case at bar, in a plurality opinion, two judges found constructive force based on "the unique situation of dominance and control presented by appellant's superior rank and position." *United States v. Clark,* 35 M.J. 432, 436 (C.M.A.1992).[40] The victim was a basic trainee; the accused was a noncommissioned officer assigned as her work-detail supervisor. Two additional judges declined to adopt a per se rule of constructive force based on the military relationship. *Id.* at 436 (concurring opinions of Judges Wiss and Sullivan).

## C. THE CONSTRUCTIVE FORCE INSTRUCTION

■ The appellant claims that the military judge erred in giving any constructive force instruction at all in this case. We review the military judge's instructional decisions for abuse of discretion, including claims that the military judge gave an instruction not warranted by the evidence. *United States v. Damatta–Olivera,* 37 M.J. 474, 478 (C.M.A.1993); *United States v. Brown,* 50 M.J. 262, 266 (1999). We review the substance of the instruction given de novo. *United States v. Maxwell,* 45 M.J. 406, 424–25 (1996).

■ We dispose of this claimed error summarily. The evidence clearly raised the issue of constructive force and the appellant's trial defense team conceded as much at several points during the trial. In a pretrial motion to dismiss numerous specifications alleging violations of 18 U.S.C. § 2242, sex by fear, the defense counsel argued that, because constructive force was one of the means by which a rape could be perpetrated under Article 120, UCMJ, the UCMJ preempted charging the same act of intercourse under Title 18 of the United States Code. The military judge agreed, and dismissed all of the 18 U.S.C. § 2242 specifications.

39. The standard instruction on the force requirement in rape offenses uses language indicating that the members may not infer consent when a victim's reasonable fear of death or *great* bodily harm prevents resistance. *See* Dep't of Army Pam. 27–9, Legal Services: Military Judges' Benchbook, para. 3–45–1, Note 4, (30 Sept. 1996) (emphasis added) [hereinafter Benchbook]. *Hicks,* 24 M.J. at 6 and *United States v. Bradley,* 28 M.J. 197, 200 (C.M.A.1989), suggest that fear of *bodily* harm is sufficient. Military rape law has certainly evolved beyond the concept that the victim must resist to the utmost, but lack of consent remains an element of most military sexual assault offenses. The statutory requirement of lack of consent found in Article 120, UCMJ, does not mandate that a victim must choose between a beating and a rape. We do not expect potential rape victims to weigh whether their assailant is likely to maim them or merely assault them if they resist. While the Benchbook instruction may require a greater degree of fear than the law actually requires, the appellant was not harmed by the instructions given in this case, for the military judge used the "great bodily harm" language.

40. Four recent cases, *Ayers,* 54 M.J. 85 (reversing a basic training instructor's convictions for two indecent assaults on a basic trainee); *United States v. Tollinchi,* 54 M.J. 80 (2000) (reversing recruiter's conviction of rape of male enlistee's girlfriend in presence of male enlistee); *U.S. v. Johnson,* 54 M.J. 67 (2000) (reversing squad leader's conviction for assault consummated by a battery for giving backrubs to female subordinate); and *United States v. Fuller,* 54 M.J. 107 (2000) (reversing maltreatment conviction for sexual relations with subordinate after she became extremely intoxicated) by our superior court stand for the proposition that rank disparity alone is not sufficient to constitute constructive force. We find those cases of limited applicability in our review of the appellant's convictions, because the evidence in this case presents far more than mere rank disparity between the appellant and his victims.

Prior to presentation of evidence on the merits, the military judge instructed the court members on the elements of rape, including the definitions of force and constructive force, without objection by the defense. Finally, during the Article 39(a), UCMJ, session in which the military judge discussed his proposed final instructions to the court members, counsel engaged in vigorous debate over the wording of the instructions on the elements of rape and the accompanying definitions. The civilian defense counsel objected to the term "compel" in the actual force instruction, but he did not contend that a constructive force instruction was unwarranted by the evidence. At the conclusion of all the instructions, neither side interposed any objection to the instructions as given.

Under these circumstances, we hold that the rape and constructive force instructions were proper and fully warranted by the evidence. We also hold that the appellant affirmatively waived any error regarding the constructive force instruction, *see United States v. Smith*, 50 M.J. 451, 455–56 (1999); Rule for Courts–Martial 920(f).

### D. RAPE SPECIFICATIONS INVOLVING RS AND SPC SP

We dispose of the appellant's legal and factual sufficiency challenges to the rape specifications involving trainees SPC SP and RS in a somewhat abbreviated fashion. The appellant's trial defense team conceded that the evidence did not raise mistake of fact as to consent with regard to either of these trainees. We concur with their assessment and find the appellant's convictions of rape of RS (one specification) and SPC SP (one specification) legally and factually sufficient.

#### 1. Rape of SPC SP

■ By his guilty plea, the appellant admitted having sexual intercourse with SPC SP in violation of OC & S Reg. 600–2. Specialist SP testified that she had a consensual sexual relationship with DS Moffett, and that she had been recycled through AIT due to a medical problem. She believed the appellant

was too harsh with her on a routine basis. Finally, she went to his office one evening before bed check and told him that she did not appreciate being picked on. The appellant laughed at her, told her he knew about her relationship with DS Moffett, shut the door, grabbed her, and kissed her as she struggled to avoid his lips and push him away. Although there were people on the same floor at the time, she did not cry out when the appellant forced her onto the bed in the room adjoining his office. He held her hands above her head, unbuttoned her uniform, pulled her pants down, and, in spite of her telling him to stop, had sexual intercourse with her. She testified that the appellant told her that women couldn't resist him, and that no one would believe her if she complained because of her previous relationship with DS Moffett.

Thereafter, she avoided the appellant. She testified that she was afraid of him. When questioned by her drill sergeant, DS Cross, a few weeks later about what was bothering her, she told him that she had sex with the appellant. Drill Sergeant Cross asked if she had done so willingly and she told him, "No." He became upset and wanted to report it, but she begged him not to, explaining that she did not want to be "held over." [41] She also feared that her previous relationship with DS Moffett would come to light. She subsequently told a friend about the rape, but did not otherwise disclose it until questioned by CID agents some seventeen months later.

SS, a classmate who was the victim of one of the appellant's indecent assaults, testified that SPC SP did not appear to her to be afraid of the appellant, although her testimony did not clearly indicate whether this was before or after the rape. Another trainee with whom the appellant had consensual sex testified that SPC SP was relaxed around drill sergeants and that she was not a truthful person.

#### 2. Rape of RS

■ The appellant did not plead guilty to any sexual contact, consensual or otherwise,

---

41. Fears about being "held over" at AIT were apparently common among the trainees, as several testified fear of being held over dissuaded

them from making complaints about the appellant's behavior.

with RS, although one witness testified that the appellant commented to her that he "got some of that," when referring to RS. At the time of the appellant's trial, RS was pending a discharge in lieu of court-martial for a lengthy absence without leave (AWOL) from her permanent duty station, Fort Hood, Texas.

RS testified that the appellant, who was not her drill sergeant, would require her to do pushups every time he saw her. He also offered to help her get her assignment changed to Germany to be near her boyfriend.

Near the end of her AIT, RS was returning to her room from the bathroom one evening after bed check. The appellant found her out of bed and ordered her to go to his office. She thought she was in trouble— he had caught her out of bed after bed check before and had made her run up and down the sidewalk as punishment. She reported to his office as ordered and waited for the appellant to return from his rounds.

When the appellant returned to his office, RS was sitting on the couch. Instead of correcting her, the appellant shut the door, approached her, kissed her, and forced her back on the couch in the process. When she begged him to stop, he put his hand over her mouth. She cried as he pulled down her shorts [42] and his pants, inserted his penis into her vagina, and had sexual intercourse with her. Afterwards, she took a shower and went to bed.

She went to sick call the next day, and was placed on quarters, but did not tell the doctor she had been raped. Later, after the appellant looked in on her once, she asked another soldier to stay with her until school was out for the day. She explained that she was afraid of the appellant, but did not tell the other soldier why.

TB–C, one of the appellant's willing sexual partners, testified that RS went AWOL from AIT because she was pregnant. When TB–C encountered RS at Fort Hood where RS was assigned after AIT, RS told her that she had sex with the appellant, but did not say she was raped. RS denied having told TB–C that she had sex with the appellant.

### 3. Conclusion

We are satisfied that the credible testimony of SPC SP and RS established each element of the offense of rape. Evaluating their testimony and the evidence as a whole and recognizing that the court members had the opportunity to see and hear the witnesses, we find the appellant's convictions of raping SPC SP and RS both legally and factually sufficient.

### E. LEGAL AND FACTUAL SUFFICIENCY OF THE REMAINING SEXUAL ASSAULT SPECIFICATIONS

The remaining sixteen rape specifications and seven indecent assault specifications involving trainees PFC PR, PVT BT, PVT JW, and PFC KG present more difficult issues regarding the interrelated legal concepts of force, constructive force, resistance, consent, and mistake of fact. The fact of sexual intercourse in each specification is essentially undisputed.[43] The appellant's factual sufficiency challenge, however, necessitates some discussion of the facts of each charged rape to determine if the second element, that each act of intercourse was accomplished by force and without consent, was proven beyond a reasonable doubt. *See MCM,* 1995, Part IV, para. 45b(1).

With the exception of the first indecent assault on PFC PR (Additional Charge VI, Specification 8), we find her testimony and the corroborating evidence legally and factually sufficient to sustain the appellant's convictions of each of the remaining specifica-

---

42. Much of the cross-examination of RS centered on inconsistencies between her trial testimony and her statements to CID about whether her shorts were pulled down or off. The CID agent who conducted the first telephonic interview of RS, in which she first admitted that the appellant had raped her, described her as very upset and distraught during the interview when he tried to ask her whether the appellant had made sexual advances towards her.

43. The appellant's guilty pleas did not establish that he had sexual intercourse with each of these trainees on each occasion charged as rape. We find, however, that each trainee's testimony that each act of intercourse occurred was unrebutted.

tions involving PFC PR.[44] We find all the convictions involving PVT BT and PVT JW legally and factually sufficient. We find the convictions involving PFC KG all legally sufficient, but, with the exception of the specification of communicating a threat and the specifications of consensual sodomy, we do not find factual sufficiency. We will, therefore, reinstate the finding of guilty, based on the appellant's provident plea, to the lesser included offense of Charge I, Specification 3, violating OC & S Reg. 600–2 by wrongfully engaging in sexual intercourse with PFC KG on various and divers occasions. *See United States v. Maxwell*, 21 M.J. 229 (C.M.A.1986).

### 1. Offenses Involving PFC PR

The appellant was charged with and convicted, *inter alia*, of raping PFC PR on eight separate occasions. She testified, without defense objection, to ten acts of sexual intercourse, all occurring while she was on Gateway status and thus largely restricted to the unit area during her first few weeks of AIT.[45]

Private First Class PR was a twenty-one year old enlistee who joined the Army, in part, to leave an emotionally and physically abusive relationship. She testified that she was five feet, two inches tall, and weighed about 100 pounds.

She initially encountered the appellant when he observed her hugging another woman. After chastising her, he implied that she was a homosexual. She laughed at him and explained that she was not a lesbian. Thereafter, while she was waiting in the unit orderly room for her own drill sergeant, the appellant ordered her to clean a closet. She refused, telling him that cleaning the closet was not her job. He ordered her to do it anyway and then to report to his office. Believing that she was in trouble for talking back to the appellant, she cleaned the closet, and then ran to his office.

 Instead of correcting her insubordination, the appellant engaged her in a personal conversation and complimented her on her personal appearance. He asked her if she would take a risk with him. While she remained standing at parade rest in front of his desk, the appellant came out from behind the desk and grabbed her arm. She jerked away and he apologized. He then asked if he could touch her. Uncertain of what to do, she responded, "I guess." The appellant then put his arms around her waist, pulled her to him, and asked if he could kiss her. She laughed nervously, he kissed her, and she pulled away and returned to the orderly room. This incident was the basis of Additional Charge VI, Specification 8 (indecent assault). We find the appellant's conviction of this specification to be factually insufficient.

Because the appellant controlled the barracks supplies and equipment, PFC PR had to see him to get a defective lamp replaced before her room was reinspected. The appellant sent her to an unoccupied room on the second floor of the barracks. While she was testing the lamps in the room, he entered, shut the door, put his hands on her waist, and tried to kiss her, while backing her towards one of the room's beds. She verbally protested, calling him by his title "drill sergeant" and telling him "I'm not like this." He attempted to pull down her PT shorts while she held onto them. The appellant told her that he would not force her, and, after some further conversation during which he blocked the exit, the appellant left. This incident formed the basis of Additional Charge VI, Specification 10 (indecent assault). We will modify the language of this specification in our decretal paragraph to reflect an attempt to kiss her, rather than the actual kissing alleged in the specification.

Frightened, PFC PR grabbed a lamp and left. Unfortunately, she grabbed an inoperative lamp and had to return to the appellant's office to get permission again to exchange her lamp. The appellant directed her to the same room. Once again, the appellant came into the room. This time, instead of honoring her protestations and efforts to push him away, the appellant held her arms above her

---

44. We will make two technical corrections to specifications involving PFC PR in our decretal paragraphs in Part IV of this opinion to conform them to our evidentiary findings.

45. Private PR testified that she was on Gateway status for approximately four weeks because she failed her first PT test.

head, forced her onto the bed, and pulled down her PT shorts. He stepped out of his own shorts and put on a condom. In spite of PFC PR moving her knees up to her chest to stop him, he separated her legs and had sexual intercourse with her. After he ejaculated, he got up, told her he would see her later, and left the room. She cried for a while and then returned to her room. This incident formed the basis for Additional Charge III, Specification 2 (rape).

The second rape occurred when the appellant ordered PFC PR to go to a room on the third floor of the barracks, near his office. Once there, he began kissing her. She told the appellant that she wasn't comfortable with what he was doing and he said that they could go to his office. The appellant went downstairs, although his office was located on the third floor. Seeing an opportunity to escape from the appellant, PFC PR instead tried to go back to her own room on the first floor by using a different set of stairs. As she approached her room, she encountered the appellant while he was talking to some other soldiers. He reiterated the order to go to his office and she reascended the stairs to comply. While she knew the appellant intended to have sexual intercourse with her, she feared the consequences of disobeying him.

When the appellant returned to his office, he told her to go into the adjoining room, which was set up as a barracks room with beds. She told the appellant that she was not going to have sex with him. He grabbed her, kissed her, and told her to take off her PT shorts. After she refused, he pushed her onto the bed, forcibly removed her shorts, and had sexual intercourse with her. Afterwards, he told her to get dressed and that he would see her later. This rape was charged as Specification 3 of Additional Charge III.

The third rape was charged as occurring on a chair in the appellant's office. Private First Class PR testified that the appellant told her to come to his office. When she arrived, the appellant was sitting in a chair.

He pulled out his penis and told PFC PR, who was standing in front of him, to pull down her shorts and straddle him. When she refused, telling him "I don't think so," he pulled down her shorts himself. He grabbed her and she fell against him. He placed one leg, then the other, through the chair's arm holes and pulled her body down on top of his penis. When someone knocked on the door, he pushed her out of the chair arms as he stood up. She grabbed her clothes and went into the adjacent room to dress as he answered the door. While she was dressing, the appellant returned to the room and told her to stop dressing. He forced her onto the bed in the room and had sexual intercourse with her again. This encounter formed the basis for Additional Charge III, Specification 4 (rape).[46]

The next two charged rapes followed a similar pattern. The appellant ordered PFC PR to his office or to another room in the barracks. She tried to avoid complying by returning to her room, but once the appellant got her in the room of his choice, he locked the door. Each time, he undressed her after she refused to undress herself. Each time, she told him "no" and he had sexual intercourse with her in spite of her refusal. These two incidents were charged as Specifications 5 and 6 of Additional Charge III (two specifications of rape).

In the sixth charged rape, he told her to go to a room in another barracks. When he arrived several minutes later, he ordered her to take off her clothes. When she failed to do so, he pulled down her shorts. She tried to avoid his kisses and told him that she didn't want to be there. Nonetheless, he had sexual intercourse with her while he remained standing, by picking her up and placing her on his penis, with her heels resting on his shoulders. She told him that it hurt. After she got louder in her protests, he put her on a mattress on the floor and continued having intercourse with her. Afterwards, he told her to climb out the window to return to her barracks. This incident formed the basis

---

46. The second penetration in the adjacent room was not charged as an additional specification of rape. We view the circumstances surrounding these two alleged rapes as one continuous course of conduct and will make an appropriate amendment to this specification in our decretal paragraph.

for Additional Charge III, Specification 7 (rape).

The final two charged rapes and the forcible sodomy occurred in the appellant's quarters, which were located on another part of the installation. On both occasions, the appellant came to PFC PR's room after bed check and told her to meet him at the AIT school building. He sat in his car while she walked across the grass toward the schoolhouse and then followed her in his car. He told her to get inside, took her to his building, and gave her the key to his room. Once in the room, she just stood frozen when he told her to undress and did not resist when he undressed her himself. He put her on his bed, and although she told him "no," he began having sexual intercourse with her. Later, he stopped, and reversing positions, forcibly put his penis in her mouth and ejaculated. Disgusted, she went to the bathroom, rinsed out her mouth, and nearly vomited. They spent the remainder of the night in the appellant's room. He dropped her off back at the barracks the following morning. This incident formed the basis for Additional Charge III, Specification 8 (rape), and Additional Charge IV, Specification 1 (forcible sodomy).

The second visit to the appellant's room followed the same pattern. The appellant told her to meet him at the school. While he watched her from the car, PFC PR waited, and then began to return to her barracks. He drove up and yelled at her to get in the car and shut up. They went to his room, where he undressed her. He placed his penis against her anus, but desisted when she told him, "no." He then entered her vagina from behind. They again spent the night in his room. This incident formed the basis for Additional Charge III, Specification 9 (rape) and Additional Charge IV, Specification 2 (indecent assault as a lesser included offense of the charged sodomy).

Several weeks after the sexual activity ceased, PFC PR was notified that she had chlamydia, a sexually transmitted disease. Since she had not had sexual intercourse with anyone other than the appellant since her pre-induction physical, she confronted the appellant about giving her the disease. She angrily told DS Cross that the appellant had given her chlamydia. She was aware that DS Cross knew that the appellant had sexual intercourse with her.

Private First Class PR explained that she did not report the appellant because she was afraid no one would believe her, that it would be the word of a private against that of a staff sergeant. She commented that people, cadre, and students alike, looked up to the appellant. Until she was off Gateway status and could leave the barracks area, she could not avoid the appellant. She lived in the barracks where his office was located, and if she did not comply with his orders to come to his office, he would simply send someone to fetch her. She described the pattern in the appellant's sexual assaults as "always the same." She would resist or try to push him away, while he would use his greater weight to hold her down. Short of using a weapon, she testified that she could do nothing more physically. The sexual abuse largely ceased when she got off Gateway status, although thereafter the appellant made her perform personal services such as shining his boots and indecently assaulted her. This subsequent assault, in which the appellant cornered her and fondled her breasts, formed the basis for Additional Charge VI, Specification 11.

She later reported the appellant, albeit reluctantly, for a physical assault on her at the conclusion of her AIT. While in a van with him and several other soldiers, she was disrespectful and insubordinate, and the appellant punched her repeatedly in the arm. The bruises were painful and visible to others. Although the appellant told her not "to run her mouth" after the assault, she told others, including her own drill sergeant what had happened, but she initially refused to identify who caused the injury. In a meeting with the battalion's command sergeant major (a woman), she reported the physical assault but did not report the repeated rapes. Another soldier in the van corroborated her account of the assault and the threat, but testified that he did so reluctantly, after considerable pressure from police investigators, because he didn't want to get involved. He indicated that he was treated badly by other

trainees loyal to the appellant after he implicated the appellant. The appellant was convicted of this assault (Additional Charge V, Specification 1).

Several witnesses corroborated other parts of PFC PR's account. Doctor (Dr.) (Major) Ritchie, an Army psychiatrist, testified that PFC PR was detailed to show Dr. Ritchie the unit area where some of the offenses had occurred. Doctor Ritchie described PFC PR as very distraught, tearful, and overwhelmed when PFC PR entered a particular room. Doctor Ritchie testified that PFC PR indicated that the appellant had raped her in that room.

Another female soldier testified that PFC PR told her that she and the appellant had sexual intercourse more than once. Although PFC PR did not use the term "rape," PFC PR told the witness in the same conversation that drill sergeants were bad and did "cruddy" things to people. The witness described PFC PR as angry when she talked about the appellant.

Another witness substantiated PFC PR's reluctance to go to the appellant's room and testified that she had accompanied her on one occasion. The appellant told her to leave, but PFC PR signaled that she did not want the witness to go. She also testified that PFC PR had admitted having sexual intercourse with the appellant, but not in a boasting or bragging context. She described PFC PR as "sad."

Two weeks before PFC PR learned that she had chlamydia, she reluctantly admitted to another trainee that she had sex with the appellant. This soldier also testified that the appellant would frequently call for PFC PR and that she was visibly reluctant to go to his office. On three or four occasions, PFC PR asked the witness to go with her. After PFC PR reported the appellant for his nonsexual assault on her in the van, both this witness and PFC PR received threats from other soldiers who admired the appellant.

2. Offenses Involving PVT BT

The appellant's conduct with PFC PR paralleled his conduct with PVT BT, although the five charged rapes of PVT BT occurred nearly ten months later, after the appellant's

transfer to A Company. Private BT was twenty-one, stood four feet, eleven inches tall, and weighed about 118 pounds while in AIT. The appellant was her drill sergeant.

Although PVT BT testified that she was afraid of the appellant, she talked to him privately one day after mail call, in response to the appellant's invitation to talk with anyone experiencing problems in AIT. After the appellant provided some general encouragement, he began asking her questions about her background. Then he asked her what she would think if her drill sergeant wanted to "fool around" with her. She thought he was joking and did not respond.

The appellant told her to come to his office, which was located on the same floor where the female trainees were billeted, that evening around 1900 hours to do some paperwork for him. When she reported, he told her to shut the door and come to his desk. While she stood in front of his desk, he came around to the front of it and began rubbing her body and kissing her. He told her to go to the bathroom between his office and the adjacent room, occupied by another drill sergeant. When she did so, he locked the outer door and the door to the other room. She testified that she didn't want to get hurt, so she did what he told her to do, including taking off her own clothes. He put on a condom, pushed her against the wall, and had sexual intercourse with her. When she began crying, the appellant told her to shut up. After he ejaculated, he told her to get dressed and get out. She did as he ordered. This incident formed the basis of Charge II, Specification 1 (rape).

About three days later, the appellant called PVT BT to his office again. He told her to sit on the couch and take off her clothes. She complied. He put on a condom and began having sexual intercourse with her while her feet were in the air. She told him that it hurt and tried to push him away. He grabbed her hands and held them between her legs until he ejaculated. Afterwards, he told her to get dressed and get out. This incident was charged as Charge II, Specification 2 (rape).

A few weeks later, the appellant again called PVT BT to his office and had her sit

down on the couch. After slapping her in the face with his penis, he told her to pull down her pants and turn around. He put on a condom and had sex with her from behind, with his hands holding her hips. Once again, after he finished, he told her to get dressed and leave. These events were charged as Charge V, Specification 1 (indecent assault by slapping his penis against her face) and Charge II, Specification 3 (rape).

The next sexual encounter occurred when PVT BT had been placed on quarters for tonsillitis. After turning her sick slip into the appellant, PVT BT went to her room to take a shower and go to sleep. While she was showering, the appellant pulled the shower curtain aside and told her to report to a particular room in five minutes. She took her time in getting dressed. As she left her room, she saw the appellant in the hallway outside waiting for her. He ordered her to hurry because another drill sergeant was coming. As directed, PVT BT ran to the designated room. The appellant came in, locked the door behind him, and locked the door to the adjacent room. The appellant removed her clothes, told her to lay down on the bed, put on a condom, and began having sex with PVT BT while she had one leg in the air. While having intercourse with PVT BT, the appellant placed his hand on her neck and told her he had a friend who also wanted to "fuck" her, and that they were going to "ride a train" on her. This incident formed the basis for Charge II, Specification 4 (rape).

The appellant came to her room at bed check during August 1996. Finding PVT BT awake, he asked her to come to his office. She paced for a while, trying to steel herself for what she expected the appellant wanted. When one of her roommates woke up, PVT BT told her to go back to sleep and that she had to go see the drill sergeant. She finally went to the appellant's office and waited for him. When he arrived, he told her to take off her shorts, sit on the couch, and masturbate. She told him, "no." When he insisted, she told him that she did not know what to do. After he gave more explicit instructions, he watched her masturbate for a few minutes. The appellant started rubbing himself

and said, "I think I'll get some." Then he went to a filing cabinet, removed a condom, and told her to stand up, turn around, and arch her back. When she did not arch it sufficiently to suit him, he pushed down on her back and had sexual intercourse with her from the rear. Once again, after ejaculating, the appellant told PVT BT to get dressed and leave. These events formed the basis for Charge V, Specification 5 (indecent acts by forcing her to masturbate while he watched) and Charge II, Specification 5 (rape).

Private BT indicated that she did not report the appellant because she felt that no one would take her word over his. Graduation was near, and all she wanted to do was to finish her training and leave. She explained that the appellant's size and personality were such that she was afraid to resist his sexual advances because she feared he might injure her. She testified, "I hated him with every ounce of energy in my whole entire body.... I did everything that I could possibly do to avoid him." She added that she would begin running when she got close to his office door so that he could not see her and stop her.

On cross examination, PVT BT admitted that when she reported as ordered to the appellant's office on the evening of their first sexual encounter, she thought that the appellant probably wanted to have sex with her. She nodded affirmatively when the defense counsel characterized the second meeting in the appellant's office as "essentially a date." She acknowledged that she did not verbally protest having sex with the appellant. She also testified that she was extremely reluctant to report what had transpired between them.

On redirect examination, PVT BT denied that her encounters with the appellant were dates. When she reported as ordered to the appellant's office on each occasion, she did not believe that she had a choice, because to refuse to do so would be disobeying a direct order. She explained why she felt threatened by the appellant: "Because he was a lot bigger than me. He had a lot of power over me. It didn't matter what I did; he was going to get his way anyway because of who

he was. Regardless of what I did, he was going to get what he wanted."

Two trainees testified that, at some point in their training, PVT BT had indicated that she found the appellant sexually attractive, and would like to have sex with him. One indicated that the remarks were made in a joking manner. Another trainee testified that PVT BT wore halter-tops around the barracks, including near the appellant's office, which was located on the same floor as PVT BT's room. That same trainee testified that PVT BT was not a truthful person and told stories about her home, education, and income that were not true.

### 3. Offenses Involving PVT JW

Private JW was twenty years old. She stood five feet, six inches tall, and weighed around 150 pounds while in AIT. The appellant was her drill sergeant. Private JW described him as very strict and imposing high standards. She had trouble passing her PT test because of a knee injury and could not get off Gateway status until she did.

Shortly before the 4th of July weekend, 1996, the appellant told PVT JW that if she did not pass the PT test, she would owe him eight hours. He then asked her if she knew what she would be wearing, and she responded, "PTs." The appellant told her that she wouldn't be wearing anything. Thinking that he was joking with her, she did not respond.

Later that day, the appellant called her to his office, told her to close the door, and to come closer to the desk. When she did so, standing in front of the desk in PT clothes and in the "at ease" position, the appellant exposed his penis to her and asked her to touch it. When she did not, he grabbed her hand and placed it on his penis. She testified that she was scared and embarrassed. When the appellant asked if he could touch her, she told him, "no, not here, not now," and he ordered her to get out of the room. She testified that she did not intend this as an agreement, but was embarrassed and flustered and did not know what to say. This incident formed the basis for Charge V, Specification 2 (indecent assault), which was consolidated with Charge V, Specification 7 (indecent acts).

At the appellant's direction, she reported to his office in PT uniform on a later occasion. When he attempted to kiss and touch her, she tried to pull away. He then directed her to pick up something on the floor, and when she bent over to do so (in an awkward manner, due to a leg brace that prevented her from bending her knee), the appellant placed his hand on her back and held her in a bent position. He pulled down her shorts and had sex with her from behind, while she grabbed some furniture to maintain her balance. He stopped when someone knocked on the door. She used that opportunity to pull up her clothing. The appellant told her to get out and to keep her mouth shut about what had happened. He later threatened her and told her he would kill her if she told anyone what had happened. This incident was charged as Charge II, Specification 6 (rape) and Charge V, Specification 8 (communicating a threat).

Private JW described herself as in shock and scared after this. While she wanted to tell someone, she did not know whom she could trust. She had been told that she had to have a drill sergeant's permission to see the commander or first sergeant. While there was a female drill sergeant in the company, the appellant had earlier told those he supervised not to talk to this drill sergeant for any reason because the appellant and the other male drill sergeants didn't like her. Private JW characterized the appellant as big, smart, and intimidating. He frequently commented that his superiors couldn't touch him because he was "on top."

The second rape of PVT JW occurred when she came back late from a weekend pass. The appellant told her to get into PT uniform and to come to his office. When she got there, he told her to go into the bathroom, shut the door, and take her clothes off. She went into the bathroom, but did not remove her clothes. Although she thought that he intended to have sexual intercourse with her, she didn't leave, because she feared he was setting her up—if she left, she would get into trouble for disobeying him. When the appellant came into the bathroom a few minutes later, he began to kiss her, partially removed her clothing, and had sex with her

on the bathroom floor. Afterwards, he told her to get dressed and go to formation. This incident formed the basis for Charge II, Specification 7 (rape).

Private JW confided what had happened to two other trainees. One trainee was SPC Watson, a male trainee with whom she was friendly. Although other trainees suspected that PVT JW and SPC Watson were having an affair, both testified that they did not have a sexual relationship. Specialist Watson urged her to report the appellant to the unit commander, and eventually told another trainee, EM. EM thereafter reported the appellant for sexual misconduct involving herself and used PVT JW's experiences to buttress her own account.

Other trainees testified that PVT JW was attracted to the appellant and had indicated her willingness to have sex with him. One of these witnesses admitted that she blamed PVT JW for some bad advice that had gotten the witness into trouble.[47] The other trainee said that PVT JW characterized what had happened between her and the appellant as rape and made a racially charged remark about the appellant getting what he deserved for what he had done to her.

#### 4. Offenses Involving PFC KG

Private First Class KG testified that she was twenty years old, stood five feet, five inches tall, and weighed about 128 pounds. She had been recycled to A Company after receiving nonjudicial punishment. She was living in the B Company barracks and was being considered for administrative discharge when she first met the appellant.

One day after mail call, the appellant asked if anyone was feeling stressed or had any problems they wanted to discuss. Private First Class KG went into his office and explained that she really wanted to stay in the Army. The appellant told her he would do his best to help her. Shortly thereafter, she learned that she would be permitted to complete her training and that the appellant had made a favorable recommendation on her behalf.

The next day, the appellant told her to move her belongings into the A Company barracks and to come back and see him when she was done. When she reported back, the appellant asked if she had $30.00. He gave her an index card with an address written on it and told her she "owed" him. He told her to go to that address and that he would take care of bed check. He asked her to hug him, and she did. Uncertain of what to do, she said she wanted to take a shower. He permitted her to leave, but told her to come back when she was through.

When she returned to his office about twenty minutes later, the appellant asked her what color underwear she was wearing and asked her to show it to him. After she complied, he responded that he was going to "get" her right then. Although she was scared, she followed his instructions to go into the bathroom and lock the adjoining door. The appellant joined her in the bathroom, put her on her knees and put his penis in her mouth. He then put a condom on and had sexual intercourse with her in the alcove outside the bathroom door. After he finished, he told her he would hurt her if she told anyone, told her to flush the condom down the commode, and to put her clothes on and go. The appellant was acquitted of rape, but convicted of indecent assault and consensual sodomy for this encounter (Charge II, Specification 8 (indecent assault as a lesser included offense of rape) and Charge III, Specification 1 (sodomy)).

The following Tuesday, the appellant told PFC KG to go to her room during lunch, take her clothes off, and wait for him. She did as directed. In the small bathroom attached to her room, the appellant had her perform fellatio on him and then had sexual intercourse with her. While the appellant was having sex with her, another drill sergeant knocked on the door and told the appellant to hurry up because the sergeant major was inspecting the barracks. The appellant was convicted of consensual sodomy and rape for this encounter (Charge III, Specification 2 (sodomy) and Charge II, Specification 9 (rape)).

---

47. This same trainee testified that she was threatened and physically assaulted by the appellant, but the court members acquitted the appellant of both of these charged offenses.

Because she did not think anyone would believe her, PFC KG did not report these incidents until the company commander questioned her. She initially denied having sex with the appellant, but eventually made three statements to investigators, including CID agents. She did not characterize what occurred as rape in any statement. She testified that the appellant might have believed she was willing to have sex with him and that she participated in the intercourse because she wanted the appellant to like her and accept her. She testified that she did not want the appellant to know that she was unwilling to have sex with him. She conceded that she did not physically or verbally resist the appellant. She was afraid the appellant would hurt her and feared getting into further trouble and being administratively discharged. She did what the appellant told her to do because, "he's a drill sergeant."

### 5. Discussion

The issues regarding the legal and factual sufficiency of the offenses involving each of these four trainees involve force, consent, and mistake of fact. At the outset, we reject the notion that every act of intercourse between a trainee and a drill sergeant is inherently nonconsensual. We also acknowledge that at least two of these trainees, PVT BT and PVT JW, might well have joined the ranks of the appellant's consensual sexual partners, had he approached them with more finesse. The issue, however, is not what might have been, but what the appellant actually did. An order is not an invitation and a sexual assault is not a date.

#### *Force*

■ The perpetrator's use of force—constructive or otherwise—is the element necessary to the crime of rape, not the victim's resistance. The requirement for force is separate and distinct from the requirement of lack of consent, although the same evidence may serve to establish both. We find actual and constructive force present in the rapes of PFC PR, PVT BT and PVT JW. As the trial counsel conceded in her closing argument, the appellant did not use any physical

force beyond that involved in penetration to have sexual intercourse with PFC KG.

■ On all occasions with regard to PFC PR and PVT JW, the appellant exercised some measure of actual force beyond that necessary for penetration. The actual force used by the appellant included grabbing his victims, restraining their hands, prying apart their legs, using his hands or weight to hold them immobile, pushing them onto the bed or floor, pulling them on top of him, and removing their clothing after they had refused to do so.

■ With regard to constructive force in the sexual assaults on PFC PR, PVT BT, and PVT JW, we note: (1) the appellant's physically imposing size; (2) his reputation in the unit for being tough and mean; (3) his position as a noncommissioned officer; (4) his actual and apparent authority over each of the victims in matters other than sexual contact; (5) the location and timing of the assaults, including his use of his official office and other areas within the barracks in which the trainees were required to live; (6) his refusal to accept verbal and physical indications that his victims were not willing participants; and (7) the relatively diminutive size and youth of his victims, and their lack of military experience.

We recognize that each offense must stand or fall based on the evidence: proof of one rape does not suffice to prove a second, a fifth, or even an eighth. However, we may properly consider what happened during other rapes of the same victim to determine, under the totality of the circumstances, whether the victim's level of resistance in a subsequent act of intercourse demonstrated consent or her reasoned assessment that resistance was futile. Under the facts of this case, we find actual and constructive force, as well as lack of consent, with regard to each charged act of intercourse involving PFC PR, PVT BT, and PVT JW.

With regard to the multiple rapes of PVT BT and PFC PR, we find that their fear of the appellant and his power over their lives was reasonable and fully justifies their subjective belief that further resistance would be futile. Private BT testified that the first

time the appellant raped her, she followed his orders because she didn't want to get hurt. When she cried, the appellant told her to shut up. During the second rape, she tried to push him away, and he grabbed and held her hands while forcing himself on her. While her level of resistance was significantly less in the subsequent rapes, she did what she was ordered to do because her earlier resistance had proven futile. Perhaps more clearly than any other victim, she credibly expressed her fear of the appellant, because of his size, demeanor, and treatment of her and other trainees.

As PFC PR testified, in each encounter, she would struggle, and the appellant would have intercourse with her anyway. While the level of her resistance may have ebbed and flowed in the course of the four-week period in which the rapes occurred, we are satisfied that the appellant's persistence in spite of her resistance demonstrated force beyond that required for penetration on each occasion. The appellant's orders for her to report to the locales of the rapes, his acts of removing her clothing on each occasion, and the fact that each time she physically resisted, he overcame her resistance sufficiently established the elements of force (as well as lack of consent) for each rape.

Private JW's two rapes followed a similar pattern. She was in the appellant's office pursuant to orders to be there. During the first rape, she was impeded by a leg brace that limited her mobility. Nonetheless, she pulled away when the appellant tried to touch her. He physically pulled her shorts down and forcibly held her in a bent position while he had sexual intercourse with her, giving her little or no time to further resist. In the second rape, she was called to the appellant's office for what she perceived as disciplinary reasons. When she failed to undress herself as the appellant ordered, he undressed her himself. We find both actual and constructive force present in each of these rapes.

*Lack of Consent*

 The issue is not whether these victims could have done more to prevent their rape. *Cf. United States v. Watson,* 31

M.J. 49, 52 (C.M.A.1990) (no independent duty on the part of a rape victim to manifest lack of consent in positive manner). Resistance is not an element of rape, but is merely a means by which lack of consent may be demonstrated. *United States v. Stanley,* 43 M.J. 671, 675 (Army Ct.Crim.App.1995). The level of resistance required to demonstrate lack of consent is based on the totality of the circumstances. *See Hicks,* 24 M.J. at 6 (the military judge "obviously concluded that appellant's acts were sufficient to reasonably create in the victim's mind—having regard for the circumstances in which she was placed, and her age, size, and mental condition—a genuine fear of bodily harm"). The trainees' failure to call for help or to promptly report the appellant is simply one factor we may consider in determining if they actually consented to intercourse, *see United States v. Bonano–Torres,* 31 M.J. 175, 178–79 (C.M.A.1990); *Stanley,* 43 M.J. at 675 (finding the appellant guilty of rape, notwithstanding the victim's failure to request help from a telephone caller during the assault).

In the light of our greater military and life experiences, there is a temptation to second-guess why the appellant's victims behaved as they did. A scream or yell for help on the part of just one may well have ended the appellant's reign of terror over the female trainees he abused. While we should (and do) consider their failure to even attempt to summon aid as part of the totality of circumstances, we recognize that people do not always behave logically in the face of frightening circumstances. As this court commented in *Stanley,* while we may with "detached contemplation, imagine courses of action by which the woman might have successfully resisted or otherwise foiled her attacker," such hindsight does not mean the evidence is factually insufficient. 43 M.J. at 675.

 The record in this case amply demonstrates that the appellant was in a power relationship, not a dating one, with the trainees he was accused of raping. *See Johnson,* 54 M.J. at 72 (Sullivan, J., dissenting). We factually find that PFC PR, PVT BT, and PVT JW did not actually consent to sexual activity with the appellant.

*Mistake of Fact Defense*

 Although we are convinced that the trainees did not actually consent to the appellant's sexual advances, we must also be satisfied beyond a reasonable doubt that the appellant did not entertain an honest and reasonable mistake as to their consent.[48] Evidence of force and the level of the victim's resistance are particularly relevant in determining the reasonableness of any mistaken belief the appellant may have entertained. *United States v. Pierce,* 40 M.J. 601, 605 (A.C.M.R.1994). Looking at the totality of the circumstances in this case, we conclude that the appellant did not entertain a subjectively honest or objectively reasonable belief that these trainees, with the exception of PFC KG, were consenting.

First, the appellant was a drill sergeant in their unit and knew that these trainees were being conditioned to obey the orders of their military superiors. As our superior court has noted, albeit in another context, "the subtleties of the superior-subordinate relationship and the conditioned response, consciously created from the first day of basic training, to respond almost unthinkingly to the wishes of a military superior can permit no other result." *United States v. Ravenel,* 26 M.J. 344, 349 (C.M.A.1988). While consensual sex between a trainee and a drill sergeant is certainly possible—and it appears from this record that the appellant was well acquainted with such consensual activities— the record also demonstrates that he deliberately and repeatedly used his authority as a drill sergeant to obtain access to these young women and to secure their compliance to his demands. He made the initial sexual advances in each case while the victim was standing in front of his desk after being ordered to be there, frequently with the use of some pretext—paperwork, counseling, or corrective action. In virtually every instance of sexual intercourse, he issued some order

to the victim: to report to his office or some other location; to remove their clothing; to bend over; to keep quiet about what had happened, etc. The record does not demonstrate any flirtatious activity on the part of any of the victims towards the appellant,[49] and thus, does not suggest how he could have reasonably perceived that PFC PR, PVT BT, or PVT JW were willing participants. Private JW's "not here, not now" may have sent a wrong signal initially, but she clearly evidenced her opposition to intimacy when she pulled away as the appellant tried to touch her. *See Ayers,* 54 M.J. at 89–90 (finding victim's earlier flirtations relevant to a mistake defense).

Second, with the exception of PFC KG, every victim resisted the appellant's demands, verbally, physically, or both, *see United States v. Carr,* 18 M.J. 297, 302 (C.M.A.1984) (unreasonable to disregard victim's "no"). The victims of multiple rapes may have physically resisted less as time went on, but under the circumstances, they had certainly concluded that resistance was futile.

 With regard to PFC KG, we must apply the law as we find it, not as we believe it should be, in light of the facts presented to us. While a reasonable fact finder could have found both force and lack of consent in her sexual encounters with the appellant, we are not ourselves satisfied, beyond a reasonable doubt, that the evidence is factually sufficient. We will, therefore, set aside all the findings of guilty of nonconsensual sexual offenses involving PFC KG as factually insufficient, and will appropriately reassess the appellant's sentence.

### 6. Conclusion

The appellant was a sexual predator who carefully selected his victims. His eighteen-

---

48. We have considered the recent opinion of our superior court in *United States v. Binegar,* 55 M.J. 1 (2001). We do not believe that *Binegar* altered the long-standing line of cases holding that any mistake of fact regarding a sexual assault victim's consent must be honest and reasonable. *See, e.g., United States v. Peterson,* 47 M.J. 231, 234–35 (1997); *United States v. McFarlin,* 19 M.J. 790, 792 (A.C.M.R.1985).

49. We do not consider PVT BT's wearing of halter tops in the general area of the appellant's office (which also happened to be the floor where her barracks room was located) or PFC PR's casually conversing with the appellant in the presence of other trainees to be flirtatious behavior.

month sexual crime spree demonstrated his ability to select those who would consent and those who would remain silent in the absence of consent. He used the power and authority of his position to entice willing partners and to compel unwilling ones. The appellant's abuse of his authority and position amply warranted the lengthy sentence and dishonorable discharge imposed by the court members.

## PART IV. DECISION

We have considered the matters submitted by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them to be without merit.

The findings of guilty of Specification 8 of Additional Charge VI (indecent assault on PFC PR), and Specification 5 of Charge V (indecent assault on PFC KG), are set aside and those specifications are dismissed.

The findings of guilty of Specification 8 of Charge II (indecent assault on PFC KG) and Specification 9 of Charge II (rape of PFC KG) are set aside and those specifications are dismissed. The court reinstates and affirms the lesser included finding of guilty of Specification 3 of Charge I as finds that the appellant, a permanent party soldier at the United States Army Ordnance Center and School, did at Aberdeen Proving Ground, Maryland, on various and divers occasions during the months of August and September 1996, fail to obey a lawful general order, to wit: Paragraph 4b, United States Army Ordnance Center and School Regulation 600–2, Prohibited Practices—Permanent Party and Student Personnel, dated 15 December 1992, by wrongfully engaging in sexual intercourse with [PFC KG], a female student at the United States Army Ordnance Center and School, in violation of Article 92, Uniform Code of Military Justice.

The court affirms only so much of the findings of guilty of Specification 10 of Additional Charge VI as finds that the appellant did at Aberdeen Proving Ground, Maryland, between on or about 15 September 1995 and on or about 15 December 1995, commit an indecent assault upon [PFC PR], by putting his hands on her waist, attempting to kiss her, and attempting to pull down her shorts, while in a storage room on the second floor of the barracks, with intent to gratify his sexual desires, in violation of Article 134, Uniform Code of Military Justice.

The court affirms only so much of the findings of guilty of Specification 4 of Additional Charge III as finds that the appellant did at Aberdeen Proving Ground, Maryland, between on or about 15 September 1995 and on or about 15 December 1995, rape [PFC PR], in his office at the AIT barracks, in violation of Article 120, Uniform Code of Military Justice.

The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the errors noted, the entire record, and the principles in *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), the court affirms only so much of the sentence as provides for a dishonorable discharge, confinement for twenty-two years, forfeiture of all pay and allowances, and reduction to Private E1.

Judge CARTER concurs.

BROWN, Judge, concurring.

In deciding the appellant's appeal, I felt constrained against applying the doctrine of constructive force, because I could find very few offenses in which the victim honestly felt intimidated or threatened with death or bodily harm. To be sure, many or all of the victims (PFC PR, PFC KG, PVT JW, and PVT BT) felt a reasonable fear of incurring the appellant's wrath. Whether it was a prolonged tenure on "Gateway," recycling into a later training class, disciplinary action, or possible administrative discharge, each victim feared resisting the appellant further for an understandable and articulable reason. Nevertheless, I don't believe this constitutes constructive force as defined by our superior court. In my view, it should.

I note with some puzzlement that constructive force can apply differently in cases involving parental (or analogous) compulsion.\*

---

\* Dep't of Army Pam. 27–9, Legal Services: Military Judges' Benchbook, para. 3–45–1, Notes 7 and 9 (1 Apr. 2001). These instructions are unchanged from the 30 September 1996 edition

In cases of parental compulsion, we recognize that, due to the vulnerability of children, explicit threats or displays of force are not necessary to overcome a child's resistance. Additionally, duress and the threat of punishment (which is different from physical harm) may be used to establish constructive force sufficient to find sexual intercourse by force and without consent. While the young women and men who join the Army are not children of tender years, we put new soldiers in an environment in which they are conditioned to obey, not question authority. Given the all encompassing dominion and control of drill sergeants over trainees, I believe that military judges, court-martial panels, and appellate courts should be able to consider such factors—similar to those instructed on in parental rape cases—when deliberating on or reviewing findings in drill sergeant-trainee rape cases. Until and unless Congress (or the President in the case of Article 134, UCMJ) decides to overhaul the Uniform Code of Military Justice and the Manual for Courts-Martial's current sexual crime scheme, that is the approach that our superior court should take.

of the Benchbook in effect at the time of the appellant's court-martial.