# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
LIND,[1] KRAUSS,[2] and PENLAND
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Staff Sergeant GABRIEL GARCIA**
**United States Army, Appellant**

ARMY 20130660

Headquarters, U.S. Army North Atlantic Treaty Organization
Reynold P. Masterton, Military Judge
Lieutenant Colonel Michelle L. Ryan, Staff Judge Advocate

For Appellant: Mr. Philip D. Cave, Esquire; Captain Patrick J. Scuderi, JA (on brief).

For Appellee:  Lieutenant Colonel Kirsten M. Dowdy, JA; Major A.G. Courie III, JA; Major Steven J. Collins, JA (on brief).

18 August 2015

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

PENLAND, Judge:

A panel with enlisted representation sitting as a general court-martial convicted appellant, contrary to his pleas, of two specifications of maltreatment, two specifications of rape, and one specification of forcible sodomy in violation of Articles 93, 120, and 125, Uniform Code of Military Justice,10 U.S.C. §§ 893, 920, 925 (2006 & Supp. II 2009) [hereinafter UCMJ].  The panel sentenced appellant to a dishonorable discharge, confinement for five years, and reduction to the grade of

---

[1] Senior Judge LIND took final action on this case prior to her retirement.

[2] Judge KRAUSS took final action on this case prior to his retirement.

E-1. The convening authority approved the adjudged sentence and credited appellant with sixty-three days against the sentence to confinement.

We review this case pursuant to Article 66, UCMJ. Appellant assigns multiple errors, one of which warrants discussion and relief.[3] We have considered the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982); they lack merit.

## PROCEDURAL BACKGROUND

Appellant was charged with raping and forcibly sodomizing Staff Sergeant (SSG) CC, maltreating Sergeant (SGT) KH, SGT CS, and SSG KK, and sexually harassing Chief Warrant Officer Two (CW2) TF. The panel convicted appellant of only offenses involving SSG CC, SGT KH, and SSG KK. Before trial, appellant's defense counsel alleged apparent unlawful command influence (UCI) regarding the charged rapes and forcible sodomy and moved the military judge to dismiss those charges. Alternatively, appellant requested the military judge prohibit a punitive discharge. In essence, appellant argued the President's and senior Department of Defense officials' statements regarding sexual assault, and related training sessions, Army-wide and at the local post, including mandatory viewings of *The Invisible War*, created an appearance of UCI and prevented panel members from impartially discharging their duties at his trial. The military judge denied appellant's UCI motion.

Before assembling the court-martial, the military judge allowed liberal voir dire of each prospective panel member. He also granted each of appellant's causal challenges, though none of them were based on UCI.

The government's evidence included the following relevant facts. Chief Warrant Officer Two TF testified that appellant sexually harassed her by sending her text messages in which he called her "sexy," asked her to date him and asked her to meet him at a bed and breakfast.[4] Staff Sergeant CC testified that between 1 April and 31 May 2009, appellant raped and forcibly sodomized her. She testified that she met appellant at a bed and breakfast in Friedberg, Germany, where they dined and then retired to separate bedrooms for the evening. Staff Sergeant CC testified that she did not bring a "particular set of pajamas to sleep in." Appellant entered her room and offered her clothing that was too small for him and, after he left the room,

---

[3] The granted relief is also partially based on error not raised by the parties.

[4] Sergeant KH testified that appellant called her sexually suggestive names in an email message. Sergeant CS testified that appellant called her "gorgeous" multiple times. Staff Sergeant KK testified that appellant described to her his sexual activity with his girlfriend and told SSG KK she was a "cutie" and calling her "sexy."

2

SSG CC donned it as sleepwear.  Appellant reentered SSG CC's bedroom and, according to her testimony, raped and forcibly sodomized her.

Staff Sergeant CC testified that she initially did not report appellant's misconduct, because she wanted to maintain her privacy and did not want people to "[see] the new girl as being a problem child."  She testified that she decided to "pretend like it didn't happen so that I would be able to deal with working with him."  Staff Sergeant CC continued that, as a paralegal, she was familiar with Army procedures for responding to allegations of sexual assault:

> [Y]ou have to report it to your [Sexual Assault Prevention and Response Program (SHARP) coordinator] who---you, you know, potentially, have to talk to your commander and then you go through the [Criminal Investigation Command (CID)] interview and then you have to hope that CID believes you, that JAG believes you.  Whoever opines on the case, the command has to believe in what you have to say and then who knows how many other, you know, for my case, I had to talk [to] a[] [Special Victims' Unit (SVU)[sic]] lawyer in Fort Lewis and then you talk to the victim witness liaison and then you have to tell somebody over the phone again and then you have the Article 32 hearing and then, you know, if it ever makes it to court-martial then it is like you have to go with your lawyers and the defense lawyers and then this trial.  And even as nice as everyone wants to be, you know that they are still looking at you as that girl who may or may not have been raped or the girl who cries wolf.  Either way, you have this feeling that people are just being nice to you because you are a victim.  And, you know, I take a lot of pride in being a paralegal and I like to think that we are some of the elite and I don't---I don't ever want to be seen as a victim.  You know, it is hard enough being a woman in the Army and then to be seen as someone who is even more inferior than any other female.  It is not the position I ever wanted to be in.

When asked by government counsel why she accompanied appellant and joined him for dinner on a trip to Heidelberg approximately three weeks later, SSG CC testified that she "wanted to kind of feel like things were normal."

At the end of the government's direct examination, SSG CC testified about her departure from active Army service and additional catalysts for her reporting appellant's misconduct:

[T]here were so many messages coming at me between-- there is this radio commercial that we had about [Department of Defense (DOD)] support and family members and getting, you know, mental or medical help for sexual harassment or assault. And then we had *The Invisible War* movie come out so everyone was talking about that. And then they had even mentioned it in our [Army Career Alumni Program (ACAP)] briefings. And while I am not a terribly religious person, there are certain points in your life where you start hearing things and you kind of get that feeling, like, I feel like somebody is talking to me. And at that point in my career, you know, I was older, I was more seasoned as a [s]oldier and as a [noncommissioned officer (NCO)], you know, as a staff sergeant at that point. I had almost seven years in. And I felt, like, with my family and with my career, I was finally at a point where I could say this is what happened to me by another [s]oldier and I wasn't really fearful of where my career stood. I was confident that I was closing this chapter with the Army and on a good note and that since I was getting out, you weren't going to be able to take my job, you weren't going to be able to take my credibility and my good name from me. You know, the chapter was closing and it was---it was secure at that point. And I was secure in being able to say this is what happened and not fear for any kind of repercussions or misunderstandings.

On cross-examination, defense counsel asked SSG CC about, among other things, photographs that she sent appellant.

Q: Did you e-mail him pictures of yourself?

A: Yes.

Q: You did?

A: There is one that I remember. Yes.

Q: And tell us about that picture.

A: It was a picture that I had taken post-deployment that I had mentioned I wanted it turned into a painting and he said he knew someone who could get that done. So, the picture

> was sent to him in the idea that the picture would be turned into a painting.
>
> Q: What kind of picture is that?
>
> A: It was a pin-up style picture.
>
> Q: Can you tell the panel a little bit more about that?
>
> A: I don't know what picture it was and all I can say that it was a 40's, 50's retro type photograph, nothing nude.
>
> Q: Were you in lingerie in that picture?
>
> A: There was a number of pictures, ma'am. I don't know.

Defense counsel then provided multiple photographs to SSG CC, three of which she identified as herself. One photograph depicts SSG CC, bare-shouldered and wearing a necktie; the other two depict her wearing lingerie.[5] The military judge granted the defense request to admit and publish the photographs to the panel. On re-direct examination, SSG CC was given the opportunity to explain further:

> Q: When you sent Sergeant Garcia the pictures of yourself, you told the members that you were doing so because you knew he knew someone who could turn them into a painting?
>
> A: Yes, ma'am. That is what he had told me.
>
> Q: Describe what kind of painting you wanted those to be turned into?
>
> A: So, I had had pin-up portraits done. Throughout my time in California, I visited a lot of antique shops; you see a lot of pin-up posters. It was a style that I really like, so I wanted the portraits done. I had them done and I had mentioned that I wanted to get it turned into a painting that included a military style bomber that is classically known to have portraits of pin-up women on it. And I just thought it would be nice to have a painting of a bomber with the pin-up girl being myself versus just some stock image. And

---

[5] The photographs are sexually provocative; existing Army policy would prohibit their display in the workplace.

> when I had mentioned this, he said that he knew someone who could paint and that was the reason that I sent him those photographs was in hopes of having a painting done.

On cross-examination, SSG CC testified about the extent to which her status as a sexual assault victim would affect future medical care:

> Q:  And when you were out processing, you testified that you were made aware of certain benefits given to sex assault survivors, correct?
>
> A:  Not the benefits, ma'am, just that the [U.S. Department of Veterans Affairs (VA)]---it was something that was put into your medical record that went in with your VA file.
>
> Q:  And you said that you had---you were doing an ACAP in-brief?
>
> A:  Yes, ma'am.
>
> Q:  And you had heard during the ACAP in-brief that certain medical benefits were given to people that were survivors of sex assault, correct?
>
> A:  Yes, ma'am.
>
> Q:  And you heard that in your medical file if you were a victim of sex assault that went into your medical file to be forwarded to the VA later for possible claims?
>
> A:  Yes, ma'am.

Staff Sergeant CC also acknowledged on cross-examination telling appellant, "I have your career in my hands.  If you screw with me and at any moment, I could end this."  On re-direct examination, government counsel asked SSG CC to provide context for the remark:

> It was---you know, when he would come up to talk to me and I was done with the conversation, you know, and he still wanted to joke or whatever, it was sort of a---my trying to make it a lighthearted threat about what had happened to--- I mean, it was just really the only way to ease the conversation of, like, I know what happened between us.  I know what you did to me and if you don't leave me alone,

6

> I will go tell someone. And this whole relationship between the two of us will be over. So, it had nothing to do with anything else other than trying to make light of such a terrible situation, you know, and just getting him to know, like, I remember what happened and I can go tell someone if you don't leave me alone. And instantly, he would walk away from me if I ever said that to him.

On re-direct examination, government counsel asked SSG CC, "[d]id you ever make up this accusation because you wanted some potential benefit or gain from the Veteran's [sic] Administration?" Staff Sergeant CC responded:

> Not at all. That had nothing to do with my reporting. What I wanted was for what little bit that I could---I could say to anyone and not only my psychological records from visiting mental health in Fort Lewis but also the diagnosis that was given to me after this to be part of my medical record. It had nothing to do with---I wasn't even---it is not getting paid for this. I mean there is no pay out that is worth this process whatsoever.

Then, government counsel asked SSG CC, "[h]as this process been particularly fun for you?" The military judge overruled defense counsel's objection to the question, and SSG CC answered:

> No, this process sucks. I mean, this is—you are putting yourself out on the line to have a number of people validate what happened to you and believe what you say. And you are opening your inside self to scrutiny and it is awful. And I had to not only go through this myself but I've had to tell my husband who had---who had no idea this had happened to me. I had to tell him what happened before we got married and hope that that did not destroy my marriage to him.

Defense counsel called two witnesses during appellant's case. One of them was HG, appellant's eleven year old son. HG testified that SSG CC joined him, his brother and appellant on a castle visit and swimming excursion in Dorheim during the summer of 2009. On cross-examination, SSG CC had acknowledged visiting a castle with appellant the day after the incident in Friedberg, but she testified that no children accompanied them, and she said she did not remember going swimming.

After the military judge's substantive findings instructions, counsel for both parties made closing arguments. During the government's findings argument, trial

counsel first addressed appellant's conduct with respect to SSG CC, calling it "the gravamen of these offenses." Then, the government described appellant's conduct with respect to CW2 TF:

> [Chief Warrant Officer Two TF] also told you that [appellant] wanted to ask her out. When she declined, he continued to insist. And this is telling. Where did he want to take her? To a bed and breakfast.
>
> DC: Objection, Your Honor. I believe there is a spillover issue here and a 413.
>
> MJ: It has nothing to do with 413. I don't see this as a spillover issue. Overruled.
>
> ATC: Thank you, Your Honor. To a bed and breakfast. You heard [CW2 TF] tell you that. She said she was insulted to think that a colleague would think that she was the type of woman who would just accept an invitation to stay at a bed and breakfast with someone she didn't even know their [sic] identity. . . .
>
> And the defense wants you to think that this is not a crime but it is, because it is a problem. A problem that we all in this courtroom know about, a very big problem which we explored during *voir dire* that is at the forefront of what we are trying to battle against in the Army today.

Defense counsel did not object to this last portion of the government's argument. In her closing, defense counsel said shortly before ending:

> So, why is the prosecution acting this way? Captain [MM] told you herself, the Army's number one priority right now. Congress, the Department of Defense and their Commander in Chief have told them that the need to prosecute sexual assault cases. They have designated Captain [MM] as a special victim's prosecutor. Her job is to prosecute and win sexual assault cases. Members, what is happening in this courtroom right now is not the way to accomplish that mission. You cannot take the man's liberty based on weak evidence. You cannot twist words and facts and present untruthful witnesses to take a man's liberty. The burden is much bigger than that. Don't let them shy away from that. And also, you remember, we have no burden.

On rebuttal, CPT MM responded on behalf of the government:

> Would members kindly remove the flyer from your folders, if you would, please? When you have it in front of you, when you look at the upper left-hand corner and where it says, United States versus---do you see Staff Sergeant [CC] or do you see Staff Sergeant Gabriel Garcia?
>
> Show of hands for Sergeant [CC].
>
> That is a negative response from the members.
>
> Show of hands for United States versus Staff Sergeant Gabriel Garcia.
>
> That is an affirmative response from all the members.
>
> That is right, because this is the United States versus Staff Sergeant Gabriel Garcia. And what just happened, the government would argue, is why the Army has a continuing issue with sexual assault in the military.

At this point, defense counsel announced, "[o]bjection." The military judge responded:

> Sustained. Bring this [sic] up before. The argument that sexual assault or any particular crime is a problem in the forefront of the Army, that is improper argument, members. You can only consider the facts as they were presented here in court and my instructions on the law and Army regulations, the evidence that has been presented here in court. You can't consider anyone else's views on any offenses.

During additional rebuttal argument, CPT MM said:

> Captain [AS] talked about zealous advocacy. Zealous advocacy can also go too far. . . . And the poor son, [HG], the defense's decision to bring in that poor child here and have to be put in a position to try to help his dad . . . . No child should ever have to be put in that position. . . .
>
> Do you remember [SSG CC's] testimony when she talked about this process and how she has a keen and unique

9

insight into this process because she is a paralegal?  She has seen this before.  She has seen other people go through this process because she processes these types of actions.  She said it is not just the initial report to a SHARP, it is then to your NCO, to law enforcement, to the special victim prosecutor, my colleague at Fort Lewis, Washington, to the CID agents there, to the CID agents here in Wiesbaden, Germany, to the unit victim advocate, to the victim witness liaison officer.  She would have had to continue to lie to Lieutenant Colonel [B] in front of the Article 32 investigation hearing.  She would have had to lie to Captain [HK] and myself in pretrial preparations.  Lie to this military tribunal.  For what gain?  When the prosecution asked [SSG CC], is this fun for you?  Of course it is not fun.  It is not fun to be sexually assaulted and then have to be victimized by the process again.  Maybe that is why people don't want to report sexual assault?

Defense counsel again announced, "[o]bjection."  The military judge sustained it.  Defense counsel did not object further.  After procedural instructions from the military judge, the panel deliberated for approximately three and a half hours before returning the findings.

## LAW AND ANALYSIS

This case involves numerous instances of improper argument during findings.  Some were objected to and some were not.  We discuss each instance separately and collectively assess whether they resulted in prejudice to appellant.

### A. Impermissible Spillover Argument

A soldier may only be convicted of a charge based on relevant evidence, and a corollary follows:  evidence that is relevant only to one particular charge may not be used to convict on a charge to which it is irrelevant.  Citing *United States v. Hogan*, the Military Judge's Benchbook offers instructional guidance and describes the spillover risk as:

When unrelated but similar offenses are tried at the same time, there is a possibility that the court members may use evidence relating to one offense to convict of another offense.  Another danger is that the members could conclude that the accused has a propensity to commit crime.  Dep't of Army, Pam. 27-9, Legal Services: Military Judges'

> Benchbook [hereinafter Benchbook], para. 7-17 (10 Sept. 2014)(citing *Hogan*, 20 M.J. 71 (C.M.A. 1985).

In the government's findings argument, trial counsel argued:  "[a]nd this is telling.  Where did [appellant] want to take [CW2 TF]?  To a bed and breakfast." Defense counsel objected on improper spillover and Military Rule of Evidence [hereinafter Mil. R. Evid.] 413 grounds.  The judge overruled the objection.

The military judge erred in overruling the defense's spillover objection. Defense counsel was concerned that government counsel was attempting to link appellant's unwelcome overture to CW2 TF with the charges relating to SSG CC by inviting the members to conclude that between CW2 TF and SSG CC, appellant had established a pattern of inviting other soldiers to meet with him at a bed and breakfast.  Defense counsel's concerns were valid.  The evidence that appellant invited CW2 TF to go to a bed and breakfast was intrinsic evidence of the sexual harassment offense involving her.  The evidence was extrinsic in relation to the rape and forcible sodomy offenses involving SSG CC.  If trial counsel wanted to use evidence that appellant invited CW2 TF to a bed and breakfast as extrinsic evidence to prove motive, intent, or modus operandi for the offenses involving SSG CC, trial counsel was required to follow the notice provisions of Mil. R. Evid. 404(b) and the military judge was required to make Mil. R. Evid. 404(b) findings.  "The Government may not introduce similarities between a charged offense and prior conduct, whether charged or uncharged, to show modus operandi or propensity without using a specific exception within the rules of evidence, such as Mil. R. Evid. 404 or 413." *United States v. Burton*, 67 M.J. 150, 152 (C.A.A.F. 2009); *see also United States v. Guthrie*, 53 M.J. 103 (C.A.A.F. 2000), *United States v. Kerr*, 51 M.J. 401 (C.A.A.F. 1999), and *United States v. Barnes*, 74 M.J. 692 (Army Ct. Crim. App. 2015).[6]  There is no evidence that this notice or analysis occurred in this trial. The military judge should have sustained the objection and given a curative instruction to the members regarding improper spillover to alleviate the danger that the panel would improperly use the evidence elicited to prove the maltreatment against CW2 TF to also prove the offenses against SSG CC.

---

[6] The military judge correctly decided that Mil. R. Evid. 413 was not implicated because the evidence elicited from CW2 TF was not evidence of appellant's commission of another sexual assault as contemplated by that rule.  Nonetheless, because the analysis required before admitting evidence under Mil. R. Evid. 404(b) and 413 are closely related, we conclude defense counsel's objection properly brought the issues of spillover and extrinsic evidence before the military judge  *See United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005).

### B. Constitutionally Impermissible Argument

"No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. We believe this fundamental constitutional right, which soldiers maintain while in service to the nation, is perhaps the singular bedrock for our system of justice. From it follows the presumption of innocence, overcome only when one's guilt is proven beyond a reasonable doubt in accordance with the Constitution.

"In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor . . . ." U.S. Const. amend. VI.

It is fundamentally unjust to incriminate an appellant by improperly commenting on his invocation of a constitutional right. We held in *United States v. Carr*, "it is inappropriate that any party to a court-martial should be allowed to profit, directly or indirectly, by argument on findings or sentence regarding an exercise of a constitutionally protected criminal due process right." *Carr*, 25 M.J. 637, 639 (A.C.M.R. 1987). "Whether there has been improper reference to an accused's invocation of his constitutional rights is a question of law that we review de novo." *United States v. Moran*, 65 M.J. 178 (C.A.A.F. 2007) (citing *United States v. Alameda*, 57 M.J. 190, 198 (C.A.A.F. 2002)).

During her rebuttal argument on findings, trial counsel made two improper references to appellant's exercise of his constitutional rights. First, trial counsel argued with respect to appellant's decision to call his eleven year old son, HG, as a witness:

> Captain [AS] talked about zealous advocacy. Zealous
> advocacy can also go too far. . . . And the poor son, [HG],
> the defense's decision to bring in that poor child here and
> have to be put in a position to try to help his dad . . . .No
> child should ever have to be put in that position.

Rather than focusing on HG's credibility or his testimony's relevance, government counsel invited the panel to convict appellant because he called his son to testify on his behalf as was his right to do under the Sixth Amendment. *See generally United States v. Boyer*, NMCCA 201100523, 2012 CCA LEXIS 906, (N.M.C.C.A. 2012) (error to argue to the panel to "protect the victim" rather than evaluate the evidence); *see also United States v. Ashby*, 68 M.J. 108 (C.A.A.F. 2009) and *United States v. Fletcher*, 62 M.J. 175 (C.A.A.F. 2005).

The second instance of improper argument occurred during government counsel's findings argument when she invited the panel to convict appellant because

of his exercise of his Sixth Amendment right to confront witnesses against him. During redirect examination of SSG CC, government counsel was attempting to rehabilitate her credibility after defense counsel challenged her motives for coming forward with sexual assault allegations approximately three years after the fact. One of the defense challenges was that SSG CC did not make her allegations until she was advised that if she alleged a sexual assault in her file with the U.S. Department of Veterans Affairs (VA), she would be eligible to file a claim and receive VA benefits. Answering government counsel's question, "[h]as this process been particularly fun for you?" Staff Sergeant CC responded with the narrative previously quoted.

In light of our disposition of this case, we need not decide whether the military judge erred in overruling the defense objection to government counsel's question. Under the "invited reply doctrine," government counsel may properly rebut defense counsel's inference that SSG CC made her allegations of sexual assault to obtain VA benefits. *United States v. Gilley*, 56 M.J. 113, 120-121 (C.A.A.F. 2001). The problem with the question in this case was its vagueness and tendency to elicit any number of objectionable responses which would far exceed what the "invited reply" doctrine allows. *Id.*

We conclude government counsel overstepped the bounds of proper argument when using SSG CC's response to argue, "[i]t is not fun to be sexually assaulted and then have to be victimized by the process again." The government's argument that SSG CC had been "victimized by the process," and its rhetorical question about the reason for victims' reluctance to report allegations of sexual assault tacitly suggested that the panel believe SSG CC, lest they further victimize her, and invited them to convict appellant because he had "revictimized" Staff Sergeant CC anew by asserting his constitutional rights to demand a trial and confront her through cross-examination.[7]

### C. Unlawful Command Influence in Argument

At the appellate level, to prove there was unlawful command influence at trial, appellant "must (1) show facts, which if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the cause of the unfairness." *United States v. Simpson*, 58 M.J. 368, 374 (C.A.A.F. 2003) (quoting *United States v. Biagase*, 50 M.J. 143, 150

---

[7] The improper portion of sentencing argument in *Carr* was similar, where government counsel argued on sentencing that the victim: *"had to undergo the constitutional right of the defendant to question and confront his witnesses – granted, but [the alleged victim] nonetheless has had to undergo extensive direct examination and over an hour of cross-examination yesterday facing serious insinuations that she was lying. . . ."* *Carr*, 25 M.J. at 638.

(C.A.A.F. 1999). Evaluating whether appellant has met this burden, we "must consider apparent as well as actual unlawful command influence." *Id.* at 374.

We interpret portions of the government's argument as citing Army policy objectives, at least in part, as the basis for convicting appellant. In this regard, the government's findings argument created the appearance of unlawful command influence for specifications related to SSG CC.

We commend the extensive *voir dire*, which enabled the parties to understand whether prospective members were aware of inarguably widespread efforts— including remarks by the Commander-in-Chief—to increase awareness of and prevent sexual assault in the armed forces. These were important preliminary questions, leading to subsequent ones to assess whether such awareness compromised prospective members' ability to find facts based solely on the evidence and law applicable to appellant's trial. Much like the panel described in *United States v. Simpson,* (holding, among other things, that the Army's "'zero tolerance' [sexual harassment] policy was not improperly injected into the trial . . . ."), the panel's responses may be similarly described as "display[ing] a sophisticated understanding that the policy was a matter of leadership, not law, which had no relationship to their duties as court members." *Simpson*, 55 M.J. 674, 686 (Army Ct. Crim. App. 2001). Like *Simpson*, appellant's court-martial exemplified "the tension between ensuring a fair trial in a particular case and the need for command policies to address the discipline and morale problems from which the court-martial stems." *Id.*

After the parties and the military judge were apparently satisfied through *voir dire* that the members would consider only the evidence in appellant's case and follow the military judge's instructions on the law, the government violated those fundamental constraints. Trial counsel departed from the example set by government counsel in *Simpson*, who "scrupulously avoided any references to the Army's policy on sexual harassment during argument." *Id*. Instead, trial counsel plainly reminded the panel of systemic challenges associated with sexual assault ("a very big problem which we explored during *voir dire*") and the primacy of Army efforts to address those challenges ("at the forefront of what we are trying to battle against in the Army today.")

Efforts undertaken to address sexual assault occurrence, reporting and prevention are subject to the "proper exercise of the command function. What is improper is the reference to such policies before members which . . . brings the

commander into the deliberation room." *Id.* (quoting *United States v. Grady*, 15 M.J. 275, 276 (C.M.A. 1983).[8]

In light of the three factors in *Simpson*, we first conclude government counsel's multiple improper references to Army-wide efforts to respond to and prevent sexual assault created the appearance of unlawful command influence. As set forth below in our prejudice analysis, we conclude that the proceedings were unfair and that the government's persistent and improper references to Army policy were a source of an unfair trial.

### *D. Prejudice*

In cases of improper argument we assess whether prejudice exists by examining and balancing three factors: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction. *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005); *see also United States v. Frey*, 73 M.J. 245, 249 (C.A.A.F. 2014).

---

[8] In *Grady*, an Air Force case involving the illegal transfer and use of marijuana, trial and defense counsel's sentencing arguments referred to a Strategic Air Command (SAC) policy which took a tough stance on illegal drugs. When a member of the panel asked to review the policy, the military judge replied:

> [R]egardless of what SAC policy is, or any other policy is, it is your independent determination of what is an appropriate sentence in this case which should determine what sentence you vote for or impose.

Observing the military judge's intervention did not remedy the error, our superior court's predecessor wrote:

> [T]he repeated references to SAC command policy as to the disposition of drug offenders was prejudicial error, and the military judge's failure to interrupt at first mention and give appropriate limiting instructions exacerbated the error. . . . It is the spectre of command influence which permeates such a practice and creates "the appearance of improperly influencing the court-martial proceedings" which "must be condemned."

*Grady,* 15 M.J. at 276, quoting *United States v. Hawthorne*, 7 U.S.C.M.A. 293, 297, 22 C.M.R. 83, 87 (1956).

Considering the first *Fletcher* factor, the severity of misconduct here was significant. First, the government impermissibly argued "spillover" evidence. Second, the government repeatedly derogated appellant's constitutional rights to demand a trial, confront witnesses called against him, and present witnesses in his defense when insinuating appellant should not have called his son as a witness and that SSG CC is being "revictimized by the process." Third, with multiple references—some overt and others thinly veiled—to the Army's efforts to confront sexual assault, the government attempted to impermissibly influence the panel's findings by injecting command policy into the trial.

Regarding the second *Fletcher* factor, and under the circumstances of this case, the military judge's actions were insufficient to cure the government's arguments regarding improper spillover, appellant's son as a witness, and the revictimization of SSG CC by the process. We recognize the military judge's efforts to keep government counsel within the bounds of proper argument when she integrated the Army's problem with sexual assault into her argument. In response to defense objection, he curatively instructed the panel that the government's argument that "sexual assault or any particular crime is a problem in the forefront of the Army" was improper. However, government counsel persisted in rebuttal when, immediately after characterizing SSG CC as "victimized by the process again," she asked the rhetorical question, "[m]aybe that is why people don't want to report sexual assault?" The military judge immediately sustained defense counsel's objection to this argument, but without a curative or limiting instruction. We conclude the military judge's intervention did not remove the threads of impermissible matters woven into the government's findings argument.

Evaluating the third *Fletcher* factor, we find the weight of the evidence supporting the convictions involving SSG CC was weak. Staff Sergeant CC accepted appellant's offer of his clothes to wear as pajamas during the night in question, but she was unable to explain what prompted appellant to offer them. Staff Sergeant CC did not report her allegations until multiple years after the incident in Friedberg. Though SSG CC testified that she tried to maintain a minimal, normal working relationship with appellant after the incident, she agreed to travel alone and meet him shortly afterward in Heidelberg, shopping and dining with him. Staff Sergeant CC also provided appellant with multiple photographs of herself, scantily clad, testifying that she sent him these photographs so that he might have them reduced to and returned to her as a pin-up style painting. She also testified that she could not remember whether she sent him the photographs before or after the Friedberg trip, though the trip occurred shortly after her moving to Germany and meeting appellant for the first time.

We conclude that appellant was prejudiced because the panel may have been swayed by the constitutionally impermissible derogations contained in government counsel's arguments and the government counsel's attempts to bring unlawful

command influence to bear on the findings. The errors in this case are confined to the charges alleging appellant's criminal acts involving SSG CC; with respect to the findings thereon and the sentence—the result is unreliable.

## CONCLUSION

The findings of guilty to Specifications 1 and 2 of Charge III and Charge III are set aside. The findings of guilt to The Specification of Charge IV and Charge IV are set aside. The remaining findings of guilty are AFFIRMED. The sentence is set aside. A rehearing may be ordered by the same or a different convening authority. *See generally* R.C.M. 810. All rights, privileges, and property, of which appellant has been deprived by virtue of the findings and sentence set aside by this decision are ordered restored. *See* UCMJ arts. 58a(b), 58b(c), and 75(a).

Senior Judge LIND and Judge KRAUSS concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court